STEPHEN A. KELLER AND ETHEL L. KELLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2656–79.     Filed July 8, 1982.

---

[7] T.C. Memo. 1959–31.

8

*Thomas G. Parrott, Julian P. Kornfeld,* and *Gilbert L. Tierce, Jr.,* for the petitioners.

*Osmun P. Latrobe,* for the respondent.

NIMS, *Judge*: Respondent determined a deficiency in petitioners' income tax of $14,202 for 1973. The issue for decision is whether petitioners are entitled to deduct $50,000 in 1973 as their distributive share of the Amarex Drilling Program, Ltd.–72/73 partnership losses. The resolution of this question

depends upon the resolution of the following underlying issues: (1) Whether Amarex Drilling Partnership No. 72/73-D is entitled to deduct $635,560.71 in 1973 for prepaid intangible drilling and development costs; and (2) whether Amarex Drilling Partnership No. 72/73-D is entitled to deduct $137,200[1] in 1973 for management fee expenses.

This case concerns petitioner Stephen A. Keller's investment in an oil and gas program. Ethel L. Keller is a party to this proceeding solely because she filed a joint income tax return with her husband, Stephen A. Keller. Consequently, Stephen A. Keller will be referred to hereafter as the petitioner.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and the attached exhibits are incorporated herein by reference.

Petitioners resided in Minneapolis, Minn., at the time the petition in this case was filed.

Petitioners maintained their books and records and filed their income tax returns on a calendar year basis using the cash receipts and disbursements method of accounting.

The oil and gas program involved a set of related entities. Amarex, Inc. (hereinafter Amarex), is a Delaware corporation which was incorporated in December 1968. Its stock is publicly traded in the over-the-counter market. Amarex has been actively engaged in the exploration, development, and production of oil and gas since its formation. In August 1970, Amarex began organizing and promoting oil and gas limited partnerships.

Amarex Funds of Delaware, Inc. (hereinafter Amarex Funds), is a Delaware corporation which was incorporated in January 1970. Amarex Funds is a wholly owned subsidiary of Amarex. Both corporations had their principal place of business in Oklahoma City, Okla.

The oil and gas program had two tiers of limited partnerships. Amarex Drilling Program, Ltd.–72/73 (hereinafter the program partnership) was formed on October 11, 1972, as an

---

[1]Respondent conceded at trial that the correct amount of the management fee expense at issue herein is $137,200, rather than the amount of $138,200 which was disallowed in the notice of deficiency.

Oklahoma limited partnership. It invested, as a limited partner, in four drilling partnerships which engaged in the exploration for, and production of, oil and gas.

Amarex and Amarex Funds were the general partners of the program partnership and of the drilling partnerships. Amarex Funds also served as the program partnership's manager and as the drilling partnerships' operator.

Investors who purchased a minimum of five $1,000 units of participation became limited partners in the program partnership. Fifteen thousand $1,000 units of participation ($15 million) were registered with the Securities and Exchange Commission[2] and were offered for sale on a "best efforts" basis by securities brokers and dealers.

The program partnership did not acquire oil or gas properties or actively engage in exploratory or developmental operations. Instead, the amounts invested in the program partnership by its limited partners were reinvested by the program partnership in four drilling partnerships (Amarex Drilling Partnership: No. 72/73-A, No. 72/73-B, No. 72/73-C, and No. 72/73-D). The program partnership participated as a limited partner in each of the four drilling partnerships. The drilling partnerships conducted the oil and gas operations.

An investor's subscription in the program partnership was allocated to the program partnership's investment in one of the four drilling partnerships. The investor's subscription was allocated to the drilling partnership which was accepting subscriptions at the time of the individual's investment. The program partnership's distributive share of a particular drilling partnership's profit and loss was allocated to the individual investors whose subscriptions had been allocated to that particular drilling partnership. The investors' distributive shares of the profit and loss were determined by the ratios of their subscriptions in the program partnership.

Each limited partner in the program partnership entered into a limited partnership agreement (hereinafter the pro-

---

[2]Amarex and Amarex Funds, the general partners, registered a prospectus on Mar. 30, 1973, with the SEC which covered all aspects of the program and drilling partnerships and the offering. At that time, the first two drilling partnerships were fully subscribed, and the general partners were accepting subscriptions for the third drilling partnership. Each drilling partnership needed a minimum of $300,000 of subscriptions before it would be activated to commence operations.

gram partnership agreement) with the general partners, Amarex and Amarex Funds. As each drilling partnership was activated, the program partnership, as limited partner, entered into a limited partnership agreement (hereinafter the drilling agreement) with the general partners, Amarex and Amarex Funds. Thus, the program partnership agreement and the drilling agreement governed the rights and obligations of the participants in this oil and gas program.

On July 31, 1973, petitioner subscribed to invest $50,000 as a limited partner in the program partnership. Petitioner's entire investment was allocated, at the time he became a limited partner, to the program partnership's investment in Amarex Drilling Partnership No. 72/73-D (hereinafter the drilling partnership). This case focuses on certain of this drilling partnership's transactions.

The drilling partnership's closing date for accepting subscriptions was August 1, 1973. It was formed as an Oklahoma limited partnership on August 14, 1973. It commenced operations shortly thereafter. A total $1,372,000, invested by 98 limited partners in the program partnership, constituted the program partnership's investment in the drilling partnership. The drilling agreement required Amarex to contribute certain oil and gas leases, mineral rights, equipment, and cash to the drilling partnership's capital.

The drilling agreement vested Amarex Funds, as operator of the drilling partnership, with full and exclusive authority to do all things necessary or desirable in conducting the business of the drilling partnership. These powers included: determining the wells and operations in which the drilling partnership would participate; making expenditures and incurring obligations necessary for the conduct of partnership activities; and determining the leases to be developed, abandoned, sold, or assigned to other parties. The program partnership was expressly excluded from sharing the power to manage or control the operations of the drilling partnership.

All revenues of the drilling partnership were split on a 50–50 basis between Amarex and the program partnership. The drilling agreement allocated deductions and credits to the party whose account had been charged with the expenditure associated with the deduction or credit. Generally, expenditures which could be deducted currently were charged to the

program partnership's account, whereas costs which had to be capitalized were charged to Amarex's account.

The drilling partnership began its drilling program in August 1973. A total of 182 wells in 14 States were drilled under the program: 63 wells were completed in 1973, 94 wells were completed in 1974, and 25 wells were completed after December 31, 1974. Of the 182 wells drilled, 27 were oil wells, 40 were gas wells, 1 was an oil and gas well, and 114 were dry wells.

The drilling partnership and the program partnership reported their incomes and expenses on the calendar year basis, and used the cash receipts and disbursements method of accounting. On its 1973 partnership tax return, the drilling partnership elected to expense intangible drilling and development costs in accordance with the provisions of section 263(c)[3] and section 1.612–4, Income Tax Regs.

The drilling partnership reported an ordinary loss (net of a small amount of income) of $1,373,257.59 on its 1973 partnership tax return. The program partnership reported a $1,372,000 ordinary loss on its 1973 partnership tax return as its distributive share of the drilling partnership's loss. The loss reported by the program partnership was limited to the amount of the basis of its partnership interest in the drilling partnership. See sec. 704(d).

Petitioners deducted a $50,000 ordinary loss on their 1973 income tax return as their distributive share of the program partnership's losses. Respondent, in its deficiency notice, determined that petitioners' share of partnership loss was $21,595, instead of $50,000, because of certain adjustments made to the drilling partnership's 1973 tax return.

The following table shows the amounts claimed as deductions by the drilling partnership on its 1973 return, as well as the amounts allowed and disallowed by the respondent:

---

[3]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, except as otherwise specifically indicated. Similarly, unless otherwise indicated, all references to Rules are to the Tax Court Rules of Practice and Procedure.

| Item | Amount claimed | Allowed | Disallowed |
|---|---|---|---|
| IDC | $1,060,483 | $424,923 | $635,560 |
| Lease operating costs | 389 | 389 | --- |
| Dry hole costs | 191,414 | 191,414 | --- |
| Administrative costs | 143,467 | 6,267 | 137,200 |
| Production taxes | 130 | 130 | --- |
| Depreciation | 2,638 | 2,638 | --- |

As to the 65 wells actually drilled under prepaid contracts, 53 drilling contracts were prepaid before spudding, 11 drilling contracts were "prepaid" after spudding but before completion, and 1 drilling contract was "prepaid" after completion.[4]

One of the 63 wells completed in 1973 involved prepayment, 55 of the 94 wells completed in 1974 involved prepayment, and 9 of the 25 wells completed after 1974 involved prepayment.

Of the 12 wells which were spudded before prepayment contracts were signed and payment was made, 1 was spudded in October 1973, 5 were spudded in November, and 6 were spudded in December.

The drilling partnership transferred $487,869.33 in December 1973 to various drilling contractors and service companies pursuant to more than 330 contracts relating to 87 proposed oil and gas wells. The contracts were executed by Amarex in its capacity as the drilling partnership's general partner. The drilling contractors and service companies were third parties, unrelated to Amarex or Amarex Funds.

The drilling partnership deducted this $487,869.33 amount on its 1973 partnership tax return as intangible drilling and development costs (hereinafter IDC). The services received by the drilling partnership in exchange for this money constitute IDC.

The drilling partnership prepaid the IDC pursuant to three types of contracts: (1) Footage and daywork drilling contracts; (2) turnkey drilling contracts; and (3) third-party well-servicing contracts. The technical drilling and servicing requirements and the price varied for each contract depending on the well to be drilled or the service to be performed. But the basic structure of each contractual obligation fitted into one of the

---

[4]For purposes of this opinion, the term "prepaid" is used to denote all contracts other than "pay-as-you-go" contracts. All of the prepaid contracts were entered into in December 1973.

three types. The characteristics of each type of contract are as follows.[5]

The footage and daywork drilling contracts were prepared on forms printed by the American Association of Oilwell Drilling Contractors and on forms printed by the International Association of Drilling Contractors.[6] These contracts contained eight pages of detailed contractual provisions.

Under this type of contract, the price for the drilling work was based on a certain amount per foot of drilling and/or a certain amount per day plus the actual amount of certain costs. Each of the footage and daywork contracts contained the following special, typed provision:

*Terms of Payment.* As consideration for terms of this Contract and the obligations of Contractor hereunder, Operator agrees to pay $ ___ to Contractor on or before December 31, 1973. Neither commencement nor completion of Contractor's performance shall be a condition precedent to this obligation to pay. Any excess of the amount otherwise due Contractor over this payment shall be paid by Operator to Contractor at the time such payment would otherwise become due. Similarly, any excess of the payment over the amount otherwise due Contractor shall be paid by Contractor to Operator upon completion of Contractor's services under this Contract.

The prepaid amount set by these drilling contracts was a reasonable estimate of the amount which would be due under the contract provisions for the complete job. These estimates were prepared by the combined efforts of technical personnel on the staffs of Amarex and the contractors. If the amount due under the contract after the work was completed exceeded the prepaid amount, then the drilling partnership was billed for the excess amount. If the amount due under the contract after the work was completed was less than the prepaid amount, then the drilling partnership received the difference as a refund.

The footage and daywork contracts also contained the following provision concerning cancellation of drilling by the drilling partnership:

---

[5]Attached as exhibits to the stipulation of facts are 48 of the more than 330 prepaid contracts. The parties stipulated that this sample is representative of the complete set of prepaid contracts. Our description and analysis stem from this sample.

[6]The forms prepared by these two trade associations were the same in their relevant substantive provisions.

Stoppage of Work by Owner:

Notwithstanding the provisions of Par. 3 with respect to the depth to be drilled, the Owner shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder, and in such event Owner shall be under no obligation to Contractor except as follows:

If such work stoppage occurs prior to the spudding of the well, Owner shall pay to Contractor the sum of the following: (a) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the contract and by reason of the premature stoppage of the work, excluding, however, expenses of normal drilling crew and supervision; (b) ten percent (10%) of the amount of such reimbursable expenses; and (c) a sum calculated at the standby rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of work stoppage as will afford Contractor reasonable time to dismantle his rig and equipment.

If such work stoppage occurs after the spudding of the well, Owner shall pay the Contractor (a) the amount owing Contractor at the time of such work stoppage under the footage rate, applicable daywork rate, and standby rate; but in such event Owner shall pay Contractor for a minimum footage of ___ feet regardless of whether or not the well has been drilled to such depth at the time of work stoppage; or (b) at the election of Contractor and in lieu of the foregoing Owner shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of this contract and by reason of the premature stoppage of work plus the sum of $___ .

The second type of prepaid contract was the turnkey drilling contract. These contracts contained six pages of detailed contractual provisions. Unlike the footage and daywork contracts, the turnkey contracts set a price for drilling the well to a specified depth, regardless of the actual amount of time, materials, and expenses required to drill the well. These contracts provided that "the contract price provided herein shall be due and payable on or before December 31, 1973."

The turnkey drilling contracts also contained a work-stoppage provision: "The well shall be drilled to the maximum depth specified * * * unless owner [the drilling partnership] shall elect to discontinue drilling and complete or abandon it at a lesser depth."

Unlike the footage and daywork contracts, the turnkey contracts did not provide for a refund of the prepaid amount if a well was canceled. Instead, the prepaid amount was applied to the drilling of a different well.

The third type of prepaid contract was the third-party well-

servicing contract. The drilling partnership entered two forms of well-servicing contracts. The first form provided, in its entirety:

> We offer to furnish you promptly upon request within nine months from this date the services and materials listed on Exhibit A hereto. These services and materials will be furnished at the fixed consideration specified below. This offer is on the condition that you agree to pay us $ ___ on or before December 31, 1973. We understand you own or represent a ___ % interest in this well and the payment is applicable only to your interest.
>
> If these terms are satisfactory to you, please execute and return one copy of this letter to us. Each of the undersigned represents that he is authorized to execute this agreement.

## The second form provided, in its entirety:

> Attached hereto and marked Exhibit "A" is an estimate (based on our current published price schedules) showing the charges for services and materials to be furnished on each well. These estimated charges total $ ___ .
>
> [Vendor] agrees that it will, prior to December 31, 1974, furnish under its standard terms and conditions the above described services and materials if you will pay $ ___ to [Vendor] on or before December 31, 1973, and after you have executed Vendor's customary Work Order Contracts prior to the commencement of each job.
>
> In the event any of the required services and materials are furnished by [Vendor] on or after March 31, 1974, then the charges for such services and materials will be based on the published price lists of [Vendor] then in effect.
>
> If this proposal is acceptable to you, please indicate in the space provided below, attach your remittance and return the executed copy to the writer.

Attached to these agreements were exhibits which listed the specific equipment and services to be provided on specified well sites at specific unit prices. The prepayments made under both forms of service contracts were based on reasonable estimates of the amount to become due under the contracts. These estimates were prepared by the combined efforts of technical personnel on the staffs of both parties to the contracts.

Although no work stoppage or refund provisions were explicitly included in the well-servicing contracts, it was understood and agreed that the drilling partnership could stop work at any time for any reason and, in such circumstances, would receive, as a refund, that portion of the prepaid amount which had not been earned by the contractor at the time of cancellation. The parties offered no direct evidence that work was done under the third-party well-servicing contracts in 1973. However, some work must have been done in 1973 on the

contracts related to the wells spudded in 1973. Some of the third-party well-servicing contracts were canceled after the end of 1973 before any work was performed under the contracts. In some cases, therefore, the drilling partnership received, as a refund, the entire amount prepaid pursuant to the well-servicing contracts.

Most of the $487,869.33 amount transferred by the drilling partnership in December 1973 was exchanged for drilling and other services to be performed after the end of that year. The only work which we find was performed pursuant to the drilling contracts was the drilling operations which occurred between the spudding date and the completion date. No work was done in 1973 pursuant to the drilling contracts on 71 of the 87 wells for which prepayments were made. However, some work was done in 1973, as well as in subsequent years, pursuant to the drilling contracts on 16 of the wells for which prepayments were made. Finally, the drilling contract work on one well, the Bruce Nipper No. 1 prospect in Arkansas, was started and completed in 1973.[7]

The spud date and the drilling completion date of all of the wells drilled under prepaid contracts are as follows:

| Well name | State | Spud date | Completion date |
|---|---|---|---|
| Bryan No. 1 | Okla. | 12/12/73 | 12/10/74 |
| Carpenter No. 1 | " | 5/11/74 | 7/17/74 |
| Hansen No. 1 | " | 11/18/73 | 2/22/74 |
| Hawkins-Morris No. 1 | " | 2/27/74 | 5/6/74 |
| D. B. Howard No. 1 | " | 11/16/73 | 9/26/74 |
| Jackson Nos. 1–4 | " | 12/20/73 | 2/21/74 |
| McKeever Nos. 1–27 | " | 11/4/74 | 6/5/74 |
| Truman No. 1 | " | 12/5/74 | 3/11/75 |
| Westheimer Neustadt No. 1 | " | NA | NA |
| | | | |
| No. 1 Cornett | Kans. | 1/14/74 | 1/31/74 |
| No. 1 Dirks | " | 11/12/73 | 3/6/74 |
| No. 1 Hartman | " | 1/7/74 | 1/19/74 |
| No. 1 Maechtlen | " | 1/20/74 | 1/29/74 |
| No. 1 Miles | " | 4/18/74 | 6/14/74 |
| No. 1 McCall | " | 12/23/73 | 1/8/74 |
| No. 1 McKinney | " | 3/14/74 | 4/1/74 |

---

[7] For convenience of discussion in this opinion, the Bruce Nipper No. 1 well is included in the group of 16 prepaid wells spudded in 1973, although the IDC incurred in connection with this particular well is obviously fully deductible in 1973 since the drilling was completed in that year.

| Well name | State | Spud date | Completion date |
|---|---|---|---|
| No. 1 Seybert | " | 4/17/74 | 5/30/74 |
| | | | |
| J. M. Baggett No. 2 | Tex. | 1/25/74 | 3/4/74 |
| J. M. Baggett No. 3 | " | 2/16/74 | 3/28/74 |
| J. M. Baggett No. 4 | " | 3/11/74 | 4/17/74 |
| J. M. Baggett No. 5 | " | 2/2/74 | 3/4/74 |
| J. M. Baggett No. 6 | " | 2/10/74 | 3/28/74 |
| J. M. Baggett No. 7 | " | 2/25/74 | 4/17/74 |
| J. M. Baggett No. 8 | " | 3/4/74 | 6/10/74 |
| J. M. Baggett No. 9 | " | 4/8/74 | 9/11/74 |
| J. M. Baggett No. 10 | " | 3/18/74 | 9/11/74 |
| J. M. Baggett No. 11 | " | 3/26/74 | 5/14/74 |
| J. M. Baggett No. 12 | " | 4/2/74 | 9/11/74 |
| J. M. Baggett No. 13 | " | 7/21/74 | 9/3/74 |
| J. M. Baggett No. 14 | " | 8/1/74 | 10/9/74 |
| J. M. Baggett No. 15 | " | NA | NA |
| Batts Friend No. 3 | " | 4/15/74 | 1/7/75 |
| Bivins No. 1 | " | 6/10/74 | 7/3/74 |
| Bivins Nos. 1–106 | " | 12/19/73 | 1/16/74 |
| W. P. Bomar | " | 12/26/73 | 1/11/74 |
| Bowers Ranch No. 1 | " | NA | NA |
| G. Graver | " | 12/14/73 | 2/12/74 |
| Johnson-Sun Nos. 1–2 | " | 11/25/73 | 1/7/75 |
| Malone A–1 | " | 12/18/73 | 3/3/74 |
| Nusbaum No. 1 | " | 8/15/74 | 9/5/74 |
| Pitts B–1 | " | 1/25/74 | 2/15/74 |
| Tipps No. 1 | " | 11/25/73 | 3/5/74 |
| | | | |
| W. K. Engle | W. Va. | NA | NA |
| Litz Harmon No. 1 | " | 1/4/74 | 6/5/74 |
| | | | |
| Amelia Credeur No. 1 | La. | 12/17/73 | 2/12/74 |
| South Coast No. 1 | " | 2/1/74 | 3/14/74 |
| | | | |
| W. Cline Unit | Ohio | 12/9/73 | 4/10/74 |
| | | | |
| U.S. Government or National Clereton | Wyo. | 3/10/74 | 7/31/74 |
| | | | |
| Bruce Nipper No. 1 | Ark. | 10/4/73 | 12/2/73 |
| Snider No. 1 | " | NA | NA |
| | | | |
| Fink No. 1 | Neb. | 2/14/74 | 2/23/74 |
| Kosch No. 1 | " | 2/2/74 | 2/14/74 |
| Nielsen No. 1 | " | 2/8/74 | 2/12/74 |
| | | | |
| Adams No. 1 or Colby | N.Y. | NA | NA |
| Burgett No. 1 or Marek B–2 | " | 5/16/74 | 6/11/74 |

| Well name | State | Spud date | Completion date |
|---|---|---|---|
| No. 1 Cone | " | 12/28/73 | 6/4/74 |
| No. 1 Gardiner | " | 3/11/74 | 5/10/74 |
| No. 1 Hebner | " | 1/17/74 | 5/6/74 |
| No. 1 Hill or Harvey McCracken | " | 6/17/74 | 7/31/74 |
| Frost No. 1 or Merek B | " | 8/6/74 | 8/18/74 |
| Vander Bosch or Marek (A) | " | NA | NA |
| No. 1 Rose or Wroblenski | " | NA | NA |
| No. 1 Rose-Hebner or Maus No. 1 | " | 6/3/74 | 7/18/74 |
| No. 1 Torrey | " | 3/23/74 | 6/1/74 |
| No. 1 Widerick | " | NA | NA |

As a result of the cancellation of 22 of the 87 wells for which prepayments were made, over 90 separate drilling and service contracts were canceled. The amounts prepaid on these contracts were applied to different wells or were refunded to the drilling partnership (in some cases subject to penalty charges) according to the type of contract involved. The reasons for canceling the wells are not apparent from the record in this case.

Pursuant to the drilling agreement executed in August 1973, the drilling partnership was obligated to pay its operator, Amarex Funds, "per-well charges" for each well drilled by the drilling partnership (hereinafter Amarex Funds well charges or, simply, well charges). An accounting procedure attached as an exhibit to the drilling agreement set forth the schedule of rates for these well charges, as follows:

Per-Well Charges:

Operator shall charge the Joint Account the following fixed per-well charges for its supervision of the drilling and operation of wells on the Joint Property, which charges shall be in addition to any per-well charges levied by any outside party designated as operator for any given well participated in as a part of the Joint Operations.

| | Well Basis (rate per well per month) | |
|---|---|---|
| | DRILLING WELL RATE (Use total depth) | PRODUCING WELL RATE (Use current producing depth) |
| Well depth | each well | each well |
| 0–2500' | $500 | $80 |
| 2500–5000' | 750 | 110 |
| 5000–8000' | 1,000 | 110 |

| | | |
|---|---|---|
| 8000–10000' | $1,250 | $165 |
| 10000–12500' | 1,500 | 190 |
| 12500–16000' | 1,750 | 220 |

Application of Per-Well Charges:

The following limitations, instructions and charges shall apply in the application of the per-well rates as provided under Paragraph 3 of this Section III:

A. The full charge set forth above shall be imposed for each well participated in as a part of the Joint Operations, provided, however, the rates shall be reduced in the ratio of the parties' net interest therein when such interest is less than 10%. A well shall be classified as a drilling well for each month commencing with the month during which it is spudded, and terminating with the first month after it is placed on production or plugged; and the charge shall be imposed therefor at the full drilling well rate for each month, without proration.

Under the accounting procedure referred to above, the well charge was a monthly charge per well based upon the depth of a well. These charges compensated the operator for supervising the drilling operations. The well charges were separate from other charges which reimbursed the operator for its direct and indirect costs of administrative overhead and program management.

Well charges are common in the oil industry. The accounting procedure which set forth the monthly rates for Amarex Funds' well charge reflects a form established by the Council of Petroleum Accountants of North America. This form is the accepted standard in the industry for such charges. Normally, well charges are charged from the time a drilling rig moves onto a well site until the rig moves off.

On December 31, 1973, the drilling partnership and the operator, Amarex Funds, executed a letter agreement which provided that the operator would supervise the drilling of 142 specified wells in exchange for a fixed price per well, payable on or before December 31, 1973, in lieu of the monthly rate chargeable under the accounting procedure. The letter provided as follows:

We offer to furnish you supervision of the drilling of the wells listed on attached pages at the fixed consideration specified below. This offer is on the condition that you agree to pay us $150,755.38 on or before December 31, 1973. The payment is applicable only to your interest.

If these terms are satisfactory to you, please execute and return one copy of this letter to us. Each of the undersigned represents that he is authorized to execute this agreement.

On December 31, 1973, the drilling partnership transferred $147,691.38 to the operator pursuant to this agreement. The amount of this payment for well charges was calculated by multiplying the standard monthly rate set forth in the accounting procedure for a well, times an estimate of the number of months required to drill the well, and adding this amount to similarly derived amounts for each of the 142 proposed wells.

Amarex Funds performed the supervisory services, for which the prepaid drilling well charges were transferred, after the close of 1973.

The drilling partnership transferred an additional $137,200 amount to Amarex Funds in 1973. The parties to this transaction stylized it as the payment of a management fee. The drilling partnership received no benefits in exchange for this transfer.

The $137,200 amount was 10 percent of the total $1,372,000 subscription to the drilling partnership. The accounting procedure which was attached to the drilling agreement provided for such a 10-percent fee as follows:

Program Management Fee:
Operator shall, at the time of activating this Drilling Partnership, charge the Joint Account for the account of the Program Partnership Manager as a fee for its managing the activities of The Program Partnership an amount equal to 10% of Drilling Subscriptions for this Drilling Partnership.

The program partnership agreement vested the program partnership manager with the following powers:

General Powers of the Program Partnership Manager. In addition to the powers now or hereinafter granted a General Partner of a Limited Partnership under applicable law or which are granted to the Program Partnership Manager under the other provisions of these Articles, and within the limitations of the purpose for which The Program Partnership has been formed, the Program Partnership Manager shall have full authority to do all things deemed necessary or desirable by it in the conduct of the business of The Program Partnership, including, but not limited to, whether similar or dissimilar, the making of expenditures and the incurring of any obligations it deems necessary to implement the purposes of The Program Partnership; the employment of such persónnel as it deems desirable for the conduct of such activities, including permanent, temporary, or part time employees, and outside consultants or contractors, and the determination of their compensation and other terms of employment; subject only to any express limitations contained in these Articles, the acquisition, disposition, exchange, or hypothecation of any or all assets of

The Program Partnership (including without limitation The Program Partnership's interest in the Drilling Partnerships and The Program Partnership's interest in any production belonging or creditable to it through the Drilling Partnerships), and the use of the revenues of The Program Partnership, and the borrowing on behalf of and the advance of money to The Program Partnership, for any purpose, except to acquire leases after Program Subscriptions have been expended, and on any terms it sees fit, including without limitation, the financing of the conduct of the activities of The Program Partnership, the repayment of such borrowings and advances, and the conduct of additional activities by The Program Partnership provided that such assets and revenues shall only be pledged or used for the benefit of the party to whom such assets and revenues are attributable to the extent of his interest therein, provided that no lender shall be required to look to the application of proceeds hereunder, and shall be entitled to rely on the representations of the Program Partnership Manager as to its authority to enter into such financing arrangement and shall be entitled to deal with the Program Partnership Manager as if it were the sole party in interest therein both legally and beneficially; the negotiation and execution on any terms deemed desirable by it of all necessary agreements, conveyances, or other instruments, whether similar or dissimilar, required or deemed beneficial to implement the powers granted it under this Agreement, including, without limitation, the formation of Limited or General Partnerships, joint ventures, or other relationships and the execution of operating agreements with any operators selected by it or the Partnership Operator of the Drilling Partnerships to conduct any portion of physical operations undertaken pursuant thereto; the exercise, on behalf of The Program Partnership, in such manner as the Program Partnership Manager, in its sole judgment, deems best, of all rights, elections, and obligations granted to or imposed upon The Program Partnership by the Drilling Agreements, including the approval or disapproval of any amendments to a Drilling Agreement proposed by the Partnership Operator of a Drilling Partnership; the maintenance of such insurance for the benefit of The Program Partnership as it deems necessary; and the control of any matters affecting the rights and obligations of The Program Partnership, including the employment of attorneys and other incurring of legal expenses, and the conduct or settlement of claims and litigation.

The drilling agreement, however, specifically prohibited the program partnership from exercising any powers over the drilling operations:

Management: ₀

The Partnership Operator, hereinafter designated, shall conduct, direct and exercise full control over all operations of The Drilling Partnership. The Program Partnership shall not have any powers over the conduct of the operations of The Drilling Partnership, nor shall they have any right to participate in its management or control.

Under the above provisions of the accounting procedure and the drilling agreement, the program partnership was a passive conduit which funneled investors' subscriptions to the drilling partnership and channeled the drilling partnership's losses or gains to the investors. Thus, the program partnership manager's services were limited to collecting subscriptions from the individual investors, allocating the investments to the drilling partnership, keeping the books, and issuing annual reports and tax returns.

The drilling partnership made other transfers to Amarex Funds to pay Amarex Funds the costs incurred in managing the program partnership and in operating the drilling partnership. As a "direct charge" the drilling partnership reimbursed Amarex Funds for all costs of labor (salaries and wages), material, transportation, services from outside sources, damages, legal expenses, taxes, insurance, accounting services, and any other expenses related to the acquisition, development, operation, protection, and maintenance of the real and personal property owned or acquired by the drilling partnership. The drilling partnership reimbursed Amarex Funds for these expenses, whether they were incurred in Amarex Funds' role as drilling partnership operator or as program partnership manager.

The drilling partnership also paid Amarex Funds on several "indirect charges": the drilling well charges ($147,691.38); an administrative overhead charge ($6,262.09); and the "program management fee ($137,200)." The drilling well charges, as discussed previously, compensated Amarex Funds for managing and supervising the drilling operations.

The administrative overhead charge reimbursed Amarex Funds for that part of Amarex Funds' general office expenses and other indirect costs which were allocable to the drilling activity. The drilling partnership reimbursed Amarex Funds for these expenses whether they were incurred in Amarex Funds' role as drilling partnership operator or as program partnership manager. The drilling partnership paid $6,262.09 to Amarex Funds in 1973, pursuant to this administrative overhead charge.

During 1973, Amarex paid the sum of $102,900 to various securities brokers/dealers as commissions for the sales of investors' subscriptions in Amarex Drilling Program, Ltd.–

72/73 allocated to the drilling partnership, totaling 7½ percent of the $1,372,000 in subscriptions which were sold for that portion of the program allocated to partnership No. 72/73-D.

On its 1973 partnership tax return, the drilling partnership claimed $143,467.09 as a deductible general and administrative expense. This amount was composed of $137,200, for the 10-percent "management fee," and $6,262.09, for the administrative overhead charge.[8]

OPINION

This case concerns an oil and gas drilling program established by Amarex. The drilling program involved two tiers of limited partnerships: the program partnership and the drilling partnership. Individual investors, such as petitioner Stephen A. Keller, participated as limited partners in the program partnership. The program partnership was a limited partner in the drilling partnership.

Amarex and Amarex Funds were the general partners of both the program partnership and the drilling partnership. Amarex Funds also served as the program partnership manager and as the drilling partnership operator. Amarex, as a general partner of the drilling partnership, negotiated various contracts in its own name on behalf of the drilling partnership. In the discussion which follows, contracts negotiated and signed by Amarex are to be understood as having been negotiated and signed on behalf of the drilling partnership.

The drilling partnership conducted the oil and gas drilling, development, and production operations. The program partnership basically served as a conduit through which investment was channeled to the drilling partnership and through which the profits and losses of the drilling partnership were passed to the individual investors.

On July 31, 1973, Keller subscribed to invest $50,000 in the program partnership. The drilling partnership was formed on August 14, 1973, and began operations in that month. A total of 182 wells were drilled by the drilling partnership: 63 wells

---

[8]We note that the sum of $137,200 and $6,262.09 is $143,462.09, rather than $143,467.09, as stipulated by the parties.

were completed in 1973, 94 wells were completed in 1974, and 25 wells were completed after December 31, 1974.

The petitioners, the drilling partnership, and the program partnership all filed tax returns on a calendar year basis using the cash receipts and disbursements method of accounting.

The drilling partnership, after it commenced operations in August, contracted with independent third parties for the drilling, and servicing while drilling, of 117 of the above-mentioned 182 wells, on a pay-as-you-go basis. In December 1973, the drilling partnership entered into more than 330 prepaid contracts for 87 additional wells, including the remaining 65 of the 182 wells actually drilled. Later, 22 of the additional wells were canceled, leading to cancellation of more than 90 contracts. The amounts prepaid on the canceled contracts were either refunded to the drilling partnership, subject, in some cases, to penalty provisions, or applied to the drilling or servicing of another well. The drilling partnership entered three types of contracts in December 1973: (1) Footage and daywork drilling contracts; (2) third-party well-servicing contracts; and (3) turnkey drilling contracts. The drilling partnership prepaid $487,869.33 pursuant to these contracts in December 1973.

Also in December 1973, the drilling partnership prepaid $147,691.38 to Amarex Funds to supervise the drilling of the partnership's wells. The parties agree that the Amarex Funds drilling well charges constitute IDC.

Since, as stated, the drilling partnership was on the cash basis, it sought to deduct in 1973, as intangible drilling costs (IDC), not only the pay-as-you-go expenses, but also the prepaid amounts. The total amount claimed was $635,560.71. The total of these payments produced partnership losses which, if completely allowable in 1973, would permit petitioners to deduct in that year, as their pro rata share of the losses, their entire $50,000 investment in the Amarex Drilling Program, Ltd.–72/73.

Respondent allowed as deductions the drilling and well-servicing expenses incurred under the pay-as-you-go contracts, but disallowed the prepaid expenses. Respondent also disallowed a substantial part of petitioner's claimed management fee deduction, an issue separately discussed *infra*.

With regard to the prepaid IDC issue, petitioners argue,

basically, that since the drilling partnership was on the cash basis, and since there was a business purpose to support all of the prepayments, the deductions must be allowed in 1973. Petitioners also note that the contracts required prepayment[9] and that the prepaid amounts represented reasonable estimates of the costs for drilling or servicing the wells.

Respondent's rejoinder is that (1) the prepayments were in the nature of nondeductible, refundable deposits; (2) the prepayments were not actually made with a business purpose; and (3) the deductions of such payments in 1973 would result in a substantial and material distortion of income.[10]

Section 263(c)[11] directs the Secretary of the Treasury to issue regulations granting taxpayers the option to deduct as expenses IDC related to oil and gas wells. In accordance with this statutory provision, section 1.612–4, Income Tax Regs.,[12]

---

[9]The contract clauses requiring prepayment mean that the 1973 advances were not merely voluntary prepayments. Compare *Bonaire Development Co. v. Commissioner*, 76 T.C. 789, 795–796 (1981).

[10]Respondent asserts on brief that "The anticipated tax benefits to occur to the individual limited partners was considered a critical factor in the economic viability of the program partnership." The tax benefits to which respondent alludes are presumably the acceleration of the questioned deductions, since it is essentially petitioners' timing, rather than the deductibility, per se, of the IDC, to which respondent objects. His concern may further be aggravated by certain testimony in the record suggesting that it is common practice among drillers to report income by the completed contract method, including income from prepaid drilling and well-servicing contracts. As we have found as a fact, many of the wells here involved were not completed until 1974 and 1975, so the reporting of income earned by the drillers of these wells may have been substantially postponed. Other testimony indicated that drilling and well-servicing income, including income received under prepaid contracts, was taken into income by some of the drillers periodically, as earned.

[11]As in effect for 1973, sec. 263(c) provided as follows:

SEC. 263(c). INTANGIBLE DRILLING AND DEVELOPMENT COSTS IN THE CASE OF OIL AND GAS WELLS.—Notwithstanding subsection (a), regulations shall be prescribed by the Secretary under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress.

[12]Sec. 1.612–4(a), Income Tax Regs., provides:

Sec. 1.612–4. Charges to capital and to expense in case of oil and gas wells.

(a) *Option with respect to intangible drilling and development costs.* In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas. Such expenditures have for convenience been termed intangible drilling and development costs. They include the cost to

provides that an operator may elect to capitalize, or to deduct currently, IDC incurred in the development of oil and gas properties.

The parties in this case agree that the drilling partnership was an operator entitled to expense IDC.[13] They also agree that the drilling partnership properly elected on its 1973 tax return to deduct currently the IDC and that the $635,560.71 transfer involved IDC as defined in the regulations.

The basic issue for decision, therefore, concerns the proper year in which the deduction for prepaid IDC should be allowed, a question which is not addressed in section 263(c) or the regulations thereunder.[14]

---

operators of any drilling or development work (excluding amounts payable only out of production or gross or net proceeds from production, if such amounts are depletable income to the recipient, and amounts properly allocable to cost of depreciable property) done for them by contractors under any form of contract, including turnkey contracts. Examples of items to which this option applies are, all amounts paid for labor, fuel, repairs, hauling, and supplies, or any of them, which are used—

(1) In the drilling, shooting, and cleaning of wells,

(2) In such clearing of ground, draining, road making, surveying, and geological works as are necessary in preparation for the drilling of wells, and

(3) In the construction of such derricks, tanks, pipelines, and other physical structures as are necessary for the drilling of wells and the preparation of wells for the production of oil or gas.

In general, this option applies only to expenditures for those drilling and developing items which in themselves do not have a salvage value. For the purpose of this option, labor, fuel, repairs, hauling, supplies, etc., are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value. Included in this option are all costs of drilling and development undertaken (directly or through a contract) by an operator of an oil and gas property whether incurred by him prior or subsequent to the formal grant or assignment to him of operating rights (a leasehold interest, or other form of operating rights, or working interest); except that in any case where any drilling or development project is undertaken for the grant or assignment of a fraction of the operating rights, only that part of the costs thereof which is attributable to such fractional interest is within this option. In the excepted cases, costs of the project undertaken, including depreciable equipment furnished, to the extent allocable to fractions of the operating rights held by others, must be capitalized as the depletable capital cost of the fractional interest thus acquired.

[13]Contrast *Hutchinson v. Commissioner*, T.C. Memo. 1980–551.

[14]We note that sec. 1.612–4(d), Income Tax Regs., states:

(d) *Manner of making election.* The option granted in paragraph (a) of this section to charge intangible drilling and development costs to expense may be exercised by claiming intangible drilling and development costs as a deduction on the taxpayer's return for the first taxable year in which the taxpayer pays or incurs such costs; no formal statement is necessary. If the taxpayer fails to deduct such costs as expenses in such return, he shall be deemed to have elected to recover such costs through depletion to the extent that they are not represented by physical property, and through depreciation to the extent that they are represented by physical property.

This provision addresses only the manner of making the election to expense IDC. It does not

Since Keller was a limited partner in the program partnership, which was in turn the limited partner in the drilling partnership, the timing of petitioners' deductions is determined by the timing of the drilling partnership's deductions. *Resnik v. Commissioner*, 66 T.C. 74 (1976), affd. 555 F.2d 634 (7th Cir. 1977).

Respondent's argument in this case basically tracks the three-part test for current deductibility of prepaid amounts which, in Rev. Rul. 75–152, 1975–1 C.B. 144, he has postulated in the prepaid feed context.[15] We applied a similar test in our decision in *Van Raden v. Commissioner,* 71 T.C. 1083, 1096 (1979), affd. 650 F.2d 1046 (9th Cir. 1981), a prepaid cattlefeed case. We think a similar approach is appropriate in the prepaid IDC area.

Unquestionably, the first part of respondent's test, i.e., that the expenditure must be a payment rather than a refundable deposit, is a sine qua non for deductibility in any context. See, e.g., the discussion in *Sandor v. Commissioner*, 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976), a prepaid interest case. With regard to the second and third parts of respondent's analysis, we are unwilling to hold that business purpose for prepayment is an independent requirement for deductibility. Rather, as we observed in *Van Raden v. Commissioner*, 71 T.C. at 1099, "There is some overlapping of the business purpose test and the distortion of income test." Insofar as cash basis taxpayers are concerned, the two concepts are so inextricably interwoven that the material distortion analysis mandated by section 446(b) must include a substantial consideration of the business purpose aspects of the transaction. In *Van Raden*, we stated that "a substantial legitimate business purpose satisfies the distortion of income test." 71 T.C. at 1106. However, since we conclude that the evidence before us, when viewed in a

---

purport to determine the proper year for allowing a deduction for prepaid IDC. Thus, it does not affect the determination of the result in this case.

The IDC legislative history also is silent concerning the issue of timing deductions for prepaid IDC. See H. Rept. 761, 79th Cong., 1st Sess. (1945).

[15]The three-part test, as stated in Rev. Rul. 75–152, 1975–1 C.B. 144, is as follows: "*First*, the expenditure must be a payment * * * rather than a mere deposit; *second*, the prepayment must be made for a business purpose and not merely for tax avoidance; and *third*, the deduction of such costs in the taxable year of prepayment must not result in a material distortion of income."

light most favorable to petitioners, does not support an adequate business purpose for prepaying the IDC (except in connection with turnkey contracts), we must further examine the facts to determine whether there was a substantial distortion of income. We must also consider whether, in any event, section 263(c) overrides section 446(b), the clear-reflection-of-income Code section.[16]

With these preliminary observations, we now apply this analysis to the facts of this case.

The term "payment" has a special meaning for tax purposes. It does not mean a simple transfer of money by a taxpayer. *Ernst v. Commissioner*, 32 T.C. 181 (1959). A transfer of money pursuant to a binding contract also is not enough. *Owens v. Commissioner*, 64 T.C. 1, 18 (1975), affd. in part and revd. in part 568 F.2d 1233 (6th Cir. 1977). A payment occurs only when the taxpayer's money is "irretrievably out of pocket." *Ernst v. Commissioner, supra* at 186.

If, by express, implied, or customary terms, a taxpayer retains a unilateral power to get the money back, then the money transfer is a "deposit" rather than a payment. *Owens v. Commissioner, supra*; *Lillie v. Commissioner*, 45 T.C. 54 (1965) (Court reviewed), affd. 370 F.2d 562 (9th Cir. 1966); *Mann v. Commissioner*, 483 F.2d 673 (8th Cir. 1973), revg. a Memorandum Opinion of this Court; *Shippy v. United States*, 308 F.2d 743 (8th Cir. 1962). See Ward, "Tax Postponement and the Cash Method Farmer: An Analysis of Revenue Ruling 75–152," 53 Tex. L. Rev. 1119, 1123–1145 (1975). This rule prevents the possibility of taxpayer abuse which would occur if, in year one, a taxpayer transfers money to a third party and takes a deduction and, in year two, he compels a return of the money and cancels the transaction supporting the deduction.[17]

---

[16]Sec. 446(b) provides:

SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(b) EXCEPTIONS. — If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

[17]In such a situation, presumably the taxpayer would recognize the amounts received in year two as income in that year. But the value of deferral makes this scheme attractive to taxpayers and abusive of the tax system.

As previously stated, literally hundreds of contracts are involved in this case, many of which were prepaid footage and daywork drilling contracts and third-party well-servicing contracts. The footage and daywork drilling contracts contained a provision giving the drilling partnership the right to stop work under the contract at any time even though the driller had made no default. If the drilling partnership terminated the contract work pursuant to these terms, then the contract provided that:

Owner [the drilling partnership] shall be under no obligation to Contractor [the driller] except as follows:

If such work stoppage occurs prior to the spudding of the well, Owner shall pay to Contractor the sum of the following: (a) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the contract and by reason of the premature stoppage of the work, excluding, however, expenses of normal drilling crew and supervision; (b) ten percent (10%) of the amount of such reimbursable expenses; and (c) a sum calculated at the standby rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of work stoppage as will afford Contractor reasonable time to dismantle his rig and equipment.

If such work stoppage occurs after the spudding of the well, Owner shall pay the Contractor (a) the amount owing Contractor at the time of such work stoppage under the footage rate, applicable day work rate, and standby rate; but in such event Owner shall pay Contractor for a minimum footage of ___ feet regardless of whether or not the well has been drilled to such depth at the time of work stoppage; or (b) at the election of Contractor and in lieu of the foregoing Owner shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of this contract and by reason of the premature stoppage of work plus the sum of $ ___ . [18]

Pursuant to the terms of payment, the drilling partnership, upon an election to cancel the work, was entitled to receive a return of the prepaid amount less the amount due the driller under the work-stoppage provision.[19]

---

[18]The drilling partnership entered footage and daywork drilling contracts using the form contracts of the American Association of Oilwell Drilling Contractors and the International Association of Drilling Contractors. These forms both contain the reproduced work-stoppage and refund provisions.

[19]"*Terms of Payment.* As consideration for terms of this Contract and the obligations of Contractor [driller] hereunder, Owner [the drilling partnership] agrees to pay $ ___ to Contractor on or before December 31, 1973. Neither commencement nor completion of Contractor's performance shall be a condition precedent to this obligation to pay. Any excess of the amount otherwise due Contractor over this payment shall be paid by Owner to

The footage and daywork drilling contracts allowed the drilling partnership to terminate the contract and to receive, as a refund, the prepaid amounts. For example, the drilling partnership could have prepaid in December 1973, an amount to a driller pursuant to a footage and daywork contract and canceled the contract work on January 1, 1974, before the driller started work under the contract or expended money by reason of the contract. In this situation, the drilling partnership would receive, as a refund, the entire amount of the prepayment. This opportunity to receive, by unilateral action, a full refund would make the prepayments on this footage and daywork drilling contract a deposit instead of a payment of IDC.

The drilling partnership's footage and daywork contracts for wells which had not been spudded prior to January 1, 1974, fit this hypothetical description.[20] This unilateral opportunity requires that, as to the prepayments on wells not actually spudded in 1973, such prepayments be classified as deposits instead of payments and therefore are nondeductible in 1973.

The third-party well-servicing contracts contained no explicit provisions concerning cancellation of work under the contracts and refunding of the drilling partnership's prepayments. However, work on many of these contracts was stopped when the drilling partnership canceled 22 of the 87 wells for which it prepaid IDC. Several of the contractors who agreed to provide well servicing to the drilling partnership testified at trial that it was understood, although not explicitly provided, that the drilling partnership could stop work under the well-servicing contract at any time, for any reason, and, in those circumstances, would receive as a refund that portion of the prepayments which had not been earned by the contractor at the time of cancellation. Petitioners introduced no evidence to contradict this testimony.

---

Contractor at the time such payment would otherwise become due. Similarly, any excess of the payment over the amount otherwise due Contractor shall be paid by Contractor to Owner upon completion of Contractor's services under this Contract."

[20]We wish to emphasize at this point that the only contract work proved at trial was the drilling which took place between the spud date and the completion date. Although we realize that other work may have been done, no evidence of it was introduced at trial. Our findings of fact list the prepaid wells actually drilled, with spud and drilling completion dates included.

We think that, as to the wells spudded in 1973, services must have been performed under the third-party well-servicing contracts related to those wells concurrently with the drilling, notwithstanding the fact that the record contains no evidence as to what work was done under any specific contract. On the other hand, we have no basis for determining whether, or to what extent, any services were performed under these contracts in 1973 in connection with wells not spudded in 1973. On the facts in the record, therefore, we find that the drilling partnership, at the end of 1973, retained the unilateral power to compel a return of 1973 prepayments on third-party well-servicing contracts related to wells not spudded until 1974 or later. Consequently, no 1973 deduction is allowable for those amounts because they constitute mere deposits.

However, the prepayments under the footage and daywork drilling contracts and the third-party well-servicing contracts which relate to the 16 wells spudded in 1973 constitute, at least in part, payments rather than deposits. The extent to which the prepayments on wells spudded in 1973 are deductible in 1973 is discussed later in this opinion.

Also, the prepayments under the turnkey drilling contracts and the Amarex Funds well charges are discussed subsequently.

Petitioners introduced the testimony of three witnesses (including an Amarex employee) on the subject of business purpose for prepayment; respondent produced six witnesses on this issue. Quite obviously, the two vendors whom petitioners called to give testimony represent but a small sample of the many vendors with whom the drilling partnership contracted in 1973.

W. A. Wackerly, who was manager of drilling and production of Amarex during 1973, negotiated and executed most, if not all, of the prepaid IDC contracts at issue in this case. Wackerly testified, generally, that IDC would be prepaid to insure rig availability because his company drills on leases which expire in a short time if not extended by the commencement of drilling, and on farmout leases which also have short deadlines. He offered no specific instances of deadline problems, although he testified, generally, that on a farmout he might have 60, 90, or 120 days from the lease acquisition date within which to get the drilling commenced. However, Wack-

erly offered no explanation whatever as to why the deadline situation was any different in December 1973, when IDC were prepaid, than it was in October, November, and December of that year, when the pay-as-you-go contracts were entered into, and no IDC were prepaid. Nor did he offer any explanation as to why the drilling of a substantial number of wells was delayed until well into 1974, if lease expiration was a significant factor.

When asked about a number of specific wells, Wackerly could not recall why IDC were prepaid, although, as to one or two, he thought rig availability might have been a consideration. Notwithstanding Wackerly's testimony that rig supply commenced being very tight after the price of oil started to rise in 1973, he stated categorically (on direct examination) that "I've never had one minute's trouble, even in the shortage now [1980], of obtaining a drilling rig. And yet, I have had no problem in obtaining a rig to drill our prospects." We find Wackerly's candor on this point refreshing, and having observed his general demeanor as a witness, gained the overall impression that he was generally uneasy at being asked to justify the prepayments with concrete facts.

Wackerly also made some general statements to the effect that prices could be locked in by prepaying IDC. No specific instances were presented by Wackerly, however, or by any other of petitioners' witnesses insofar as the prepaid footage or daywork or well-servicing contracts were concerned.

Myrle Greathouse, president of Wes-Tex Drilling Co., testified on behalf of petitioners with regard to the J. M. Baggett No. 14 well.

Greathouse testified that he negotiated, on behalf of Wes-Tex, a turnkey contract with Amarex in which, to assure Amarex the availability of a rig and to lock in a price, Wes-Tex requested the prepayment of the IDC. The contract in question, dated December 17, 1973, provides for payment of the contract price on or before December 31, 1973. It requires Wes-Tex to "Commence drilling operations *when rig becomes available* and drill to a maximum depth of 5200, provided *this contract is not in effect until* OWNER notifies CONTRACTOR to commence drilling operations." (Emphasis added.) The record is silent as to when Wes-Tex was so notified. The contract, itself, thus directly contradicts Greathouse's testimony that

prepayment was required to assure rig availability, and since the well was not spudded until August 1, 1974, it is a reasonable assumption that Amarex as "Owner" did not notify Wes-Tex to commence drilling operations between December 17, the date of the contract, and December 31, 1973. These facts belie any assertion that rig availability was a factor that mandated prepayment in 1973. The locking in of price is, of course, an essential purpose of turnkey contracts, discussed in a subsequent section, but this fact, unless independently proved as to other than turnkey contracts, has no probative value as to such other contracts.

Petitioners produced one other witness with regard to a specific well. This well, the No. 1 Bomar, was drilled under a prepaid turnkey drilling contract, and falls within our discussion of prepaid turnkey contracts *infra*.

Respondent introduced the testimony of six witnesses regarding prepaid contracts with the drilling partnership in 1973.

R. L. Campbell, assistant treasurer and general credit manager of Halliburton Services Division of Halliburton Co., testified that Halliburton would have required prepayment if Amarex had wanted price protection for the first quarter of 1974, but that Amarex's credit was such that Campbell had no reason to doubt Amarex's ability to make timely payments. There is no testimony in the record as to the specific dollar value to Amarex of such price protection or that Amarex actually prepaid Halliburton for this reason. Yearend prepayment is a very small part of Halliburton's total volume. Halliburton does not treat prepayments as income at the time they are received, but rather takes the payments into income at the time the services are rendered.

W. A. Glass, president of Big Chief Drilling Co., testified that the prepayments made to his company were instigated by Amarex. Big Chief would have provided the services without prepayment. Less than 10 percent of Big Chief's business comes from prepaid contracts.

John M. Williams, vice president of Union Drilling, testified that his company's contract with Amarex was prepaid at the instigation of Amarex. Union Drilling had not required prepayment by Amarex on any previous contracts. Union

Drilling did not treat the prepayment under its contract with Amarex as income at the time received.

Jack Alexander, president of T.A.W., testified that Amarex "asked us if we would look at this certain job and give them an estimate on it, and if we would accept their prepayment." T.A.W. would have provided the services rendered without prepayment. Less than 5 percent of T.A.W.'s business is prepaid. T.A.W. did not require prepayment to provide it with working capital.

J. T. Shoffstall, the owner and president of Jetco, Inc., testified that Amarex initiated prepayment of the contract with his company and that his company would have provided its services to Amarex without prepayment. Shoffstall also testified that if a customer prepays, "they will get a truck before anybody else will."

S. D. Joy, vice president and general manager of Capital Well Servicing Co., testified that Amarex instigated the prepayments made to his company by Amarex. He also testified that "if it [the contract] is prepaid and he calls the job in that he's ready for us to perform our duties, then he goes to the top of the list for the next available rig."

In addition to the foregoing, H. E. Johnson, vice president of Liquid Carbonic Corp.; P. J. Millar, division account manager of Dowell, a division of Dow Chemical; W. E. Smothers, treasurer of Seismograph Services Corp.; Bill Perry, comptroller of Nichols Casing Crews; and John Loftin, senior general sales representative of the Western Co. of North America, all testified that prepayment of their Amarex contracts was instigated by Amarex and that their services would have been furnished without such prepayment.

We do not think the above-described oral testimony and the documentary evidence in this case adequately support petitioners' argument. On the basis of the record, we are not convinced that prepayment was required to assure rig or services availability which, in turn, argue petitioners, was necessary so as not to lose leasehold rights of limited duration. Furthermore, as to the 65 wells actually drilled which involved prepaid contracts, only 16 were spudded in 1973, and of these, 12 were actually spudded *before* the prepayments were made: 1 well was spudded in October, 5 in November, and 6 in December. Quite obviously, the rig-availability argument fails

to convince as a compelling motive for prepayment, and petitioners have furthermore failed to prove that prices were locked in on any of the contracts other than the turnkey contracts.

The facts concerning business purpose for prepaying the turnkey drilling contracts and the Amarex Funds well charges will be discussed subsequently.

We have determined that prepayments under footage and daywork and third-party well-servicing contracts involving wells spudded after 1973 were refundable deposits in 1973, rather than payments, and are therefore not deductible in 1973. We also have decided that petitioners have not shown a convincing business purpose for any prepayments under any footage and daywork and well-servicing contracts. Before determining the deductibility of the prepayments under the contracts for wells spudded in 1973 and completed later, and the deductibility of the prepayments under the turnkey drilling contracts and the Amarex Funds well charges, we must analyze the interaction between sections 446(b) and 263(c).

Petitioners strongly rely upon *Pauley v. United States*, an unreported case (S.D. Cal. 1963, 11 AFTR 2d 955, 63–1 USTC par. 9280), to support their position which is, in effect, that the section 263(c) election overrides the clear-reflection-of-income requirement of section 446(b). The *Pauley* court essentially based its decision upon the finding that impelling business necessity motivated the prepaid IDC involved in that case, and did not deal with the possibility that there might have been a substantial distortion of income.

In *Pauley*, the taxpayer prepaid IDC in connection with the drilling of a single oil well known as the Pacific Tube-Stewart No. 1 well. In our judgment, the crucial determination made by the District Court in support of allowance of prepaid IDC was the following:

During the course of negotiating the drilling contract, Pike Drilling Company had internal discussions concerning the manner of assuring itself of timely payments from Pauley. Prior to the subject drilling agreement, Pike Drilling Company had done little or no business with Pauley; however, they knew that Pauley was interested and involved in many other business activities. Pike Drilling Company was mainly concerned with Pauley's willingness to pay when Pike Drilling Company needed operating funds. Cash was always at a low ebb in the Pike Drilling Company. As a result of

this concern on the part of Pike Drilling Company, and during the course of several conferences with representatives of Pauley, it was agreed that Pauley would make an initial payment on the drilling contract of $95,000.00.

It seems apparent from the above finding that the independent driller neither would have nor could have commenced drilling the well without first receiving the $95,000—an impelling business reason for prepayment. Respondent subsequently announced his acquiescence in the decision for the taxpayer, in Rev. Rul. 71–252, 1971–1 C.B. 146.

It would be appropriate at this point also to mention *Dillingham v. United States,* an unreported case (W.D. Okla. 1981, 48 AFTR 2d 81–5815, 81–2 USTC par. 9601), which was decided after the parties submitted their briefs in this case, and which followed the *Pauley* approach in that the decision for the taxpayers was based upon a finding of business necessity without any discussion of material distortion of income. The *Dillingham* case involved a tier partnership arrangement similar to the one in the present case. The drilling partnership prepaid its sponsor, Basin Petroleum Corp., to drill certain oil and gas wells under turnkey contracts. The payments constituted prepaid IDC which the District Court allowed as deductions in the year of payment. The court there found that "A principal reason for the prepayment requirement was to provide Basin with working capital for the drilling of wells and to temporarily provide funds to Basin for other operations. This was a legitimate business arrangement and not merely a sham to permit the deduction of IDC's in a particular year." The District Court found that Basin had a working capital deficiency which developed as a result of a large cost overrun on the drilling of a well in 1970. No analogous fact pattern has been shown or even claimed in the case before us.

In *Stradlings Building Materials, Inc. v. Commissioner,* 76 T.C. 84 (1981), this Court considered whether a cash basis taxpayer could take a deduction for prepaid IDC in the year of prepayment. In that case, the taxpayer was a partner in a limited partnership which on June 28, 1973, two days before the end of its taxable year, prepaid IDC to a drilling contractor pursuant to a binding contract to drill six oil and gas wells. The partnership deducted the entire amount of prepaid IDC in the year of prepayment. Subsequently, the driller drilled only

one well and breached its obligation to drill the other five wells. Respondent allowed the partnership a deduction in the year of prepayment for the IDC attributable to the well which was actually drilled. Respondent disallowed deductions in the year of prepayment for the IDC attributable to the wells which were not drilled. We held that respondent's concession concerning the timing of the IDC deduction relating to the well which was drilled, effectively conceded the issue for all the wells because the taxpayers could not have been expected to foresee that the driller would breach its contractual commitment after the end of the tax year. Respondent does not, of course, make such a concession in the instant case.[21]

In discussing material distortion, we would again observe that respondent has not questioned the ultimate deductibility—only the timing—of the drilling partnership's claimed deductions for IDC.

It has long been recognized that the Commissioner is given broad discretion in determining whether a particular method of accounting clearly reflects income, and a heavy burden is imposed upon the taxpayer to overcome a determination by the Commissioner in this area. *Fort Howard Paper Co. v. Commissioner*, 49 T.C. 275, 284 (1967), citing *Commissioner v. Hansen*, 360 U.S. 446 (1959), and cases subsequent to it. See also *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979); *Sandor v. Commissioner*, 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976). Respondent's discretion under section 446(b) covers the accounting treatment of any item as well as a taxpayer's overall method of accounting. *Sandor v. Commissioner, supra*; sec. 1.446–1(a)(1), Income Tax Regs. The respondent may disallow a particular deduction of a cash basis taxpayer on the ground that the timing of the payment distorts income. *Sandor v. Commissioner, supra*. Also, Congress, in section 263(c), mandated the taxpayer's right to elect the current deduction of IDC, which otherwise would not be deductible other than through depreciation (or amortization). See *Sun Co. and Subsidiaries (Consolidated) v. Commissioner*, 677 F.2d 294 (3d Cir. 1982), affg. 74 T.C. 1481 (1980).

Petitioners argue that respondent is precluded from assert-

---

[21]See also *Cheroff v. Commissioner*, T.C. Memo. 1980–125, in which this Court considered the related issue of the timing of a deduction for prepaid IDC for an accrual basis taxpayer.

ing his section 446(b) power in this case because the distortion of income inherent in expensing IDC is expressly authorized by Congress in section 263(c). Petitioners' conclusion is erroneous because it confuses two aspects of prepaid IDC. Intangible drilling and development costs are expenditures most, if not all, of which, but for section 263(c) and section 1.612–4, Income Tax Regs., would be capitalized. Petitioners argue that Congress specifically allowed the distortion implicit in accelerating the deduction of these capital items by giving taxpayers the option to expense them. But Congress did not specify ad arbitrium that taxpayers could take the IDC deduction when paid, or mandate that prepaid IDC are immune from the general tax accounting rules relating to the timing of expense deductions. As we said in *Stradlings Building Materials, Inc. v. Commissioner*, 76 T.C. 84, 89 (1981), the timing of a prepaid IDC deduction is a question of tax accounting. Absent an express congressional mandate, we will not interpret section 263(c) to be broader than it appears on its face. IDC may be expensed. If expensed, then the rules regulating the timing of expense deductions, including the section 446(b) clear reflection requirements, must be applied.[22]

Our holding, that section 446(b) applies in this case, is supported by our holdings in analogous situations that the tax accounting rules concerning the timing of expense deductions override the broad language of the expense-deduction provisions. For example, in *Van Raden v. Commissioner, supra*, we considered, in the prepaid feed context, whether section 446(b) overrides Income Tax Regs. section 1.471–6(a), which regulation, it was suggested, may "[rise] to the dignity of the effect of law." 71 T.C. at 1102. The regulation in question gives farmers the option of reporting income by either the cash or accrual method. In the prepaid feed context of *Van Raden*, we held that even such a firmly embedded regulation as the one there

---

[22]We note that a commentator agrees with our conclusion. In discussing Rev. Rul. 80–71, 1980–1 C.B. 106, Robert Klueger states that the Revenue Service "correctly observed that merely because a taxpayer is granted the election to expense what is otherwise a capital expenditure [fn. cites sec. 263(c)], that expense, like any other allowable expenses incurred in the ordinary course of business, may be disallowed if it materially distorts income." Klueger, "Deductibility of 'Prepaid' Intangible Drilling and Development Costs," 30 Oil & Gas Tax Q. 431, 439 (Mar. 1982).

in question cannot prohibit the Commissioner from carrying out his responsibility under section 446(b).

In *Sandor v. Commissioner, supra,* the petitioner argued that section 163(a) provides that there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness and that Congress intended no exception or limitation on the deductibility of interest except those specifically mentioned in the statute. We agreed with the Commissioner that section 163 should be subject to the scrutiny of sections 446 and 461.[23] We further held that we did not believe that Congress intended that a deduction for prepaid interest should be allowed when such allowance would result in a distortion of the taxable income for the year of payment. 62 T.C. at 478. In *University Properties, Inc. v. Commissioner,* 45 T.C. 416 (1966), affd. 378 F.2d 83 (9th Cir. 1967), we required a taxpayer who prepaid rent to prorate the rental deduction over the period of the lease. Although we did not base this holding upon the clear reflection provisions of section 446(b), we nevertheless held that "Rentals may be deducted as such only for the year or years to which they are applied. If they are paid for the continued use of the property beyond the years in which paid they are not deductible in full in the year paid but must be deducted ratably over the years during which the property is so used." 45 T.C. at 421.[24] In *Commissioner v.*

---

[23]Sec. 461(a) provides as follows:

SEC. 461. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION.

(a) GENERAL RULE.—The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income.

[24]We note that we do not have to decide in this case whether we will follow the 1-year rule articulated by the Court of Appeals for the Ninth Circuit in *Zaninovich v. Commissioner,* 616 F.2d 429 (9th Cir. 1980), revg. 69 T.C. 605 (1979), another prepaid rent case. In *Zaninovich,* the appellate court held that prepaying 1 year's rent is deductible in the year of payment because the prepayment created an asset with a useful life which did not extend substantially beyond the close of the taxable year. This holding is based on the appellate court's interpretation of sec. 1.461–1(a)(1), Income Tax Regs.

The parties did not present this issue for our determination or provide a factual basis for our consideration of it. Therefore, we do not decide in this case whether we agree with the *Zaninovich* court's interpretation of sec. 1.461–1(a)(1) of the regulations or whether the 1-year rule, developed in the area of payments for benefits which vest in a predetermined period of time, is applicable in this case of prepaid IDC. See *Commissioner v. Van Raden,* 650 F.2d 1046 (9th Cir. 1981), affg. on a different ground 71 T.C. 1083 (1979). See also Klueger, "Deductibility of 'Prepaid' Intangible Drilling and Development Costs," 30 Oil & Gas Tax Q. 431, 440–441 (Mar. 1982).

*Boylston Market Ass'n*, 131 F.2d 966 (1st Cir. 1942), affg. a Memorandum Opinion of the Board of Tax Appeals, the court required that prepaid insurance be prorated over the 3-year period to which it related.

Thus this Court and other courts have held that prepayments may be scrutinized to determine whether material distortion of income exists when expenses are prepaid even though the provisions allowing deductibility of such expenses appear absolute on their face. Accordingly, we hold that section 446(b) properly applies in this case. Although the respondent may not use section 446(b) to require taxpayers to capitalize IDC, he may use section 446(b) to determine the proper timing of the expense deduction for prepaid IDC.

Having outlined the bench marks, we now can determine the deductibility of (1) the prepayments under the footage and daywork contracts and third-party well-servicing contracts relating to wells spudded in 1973; (2) the prepayments of the Amarex Funds well charges; and (3) the prepayments under the turnkey contracts.

*Contracts relating to wells spudded in 1973.*—We cannot simply prorate prepaid IDC as we have prorated period costs items such as prepaid insurance, prepaid rent, or prepaid interest. See, for example, *Commissioner v. Boylston Market Ass'n, supra*; *University Properties, Inc. v. Commissioner, supra*; *Sandor v. Commissioner, supra*. Certainly, the prepaid footage and daywork drilling contracts and prepaid well-servicing contracts do not entail "period" costs like interest, rent, and insurance, which are costs that arise with respect to time intervals rather than the creation of products or rendition of services. Instead, the prepaid IDC are more akin to, although not the same as, the concept of "product" costs as delineated in *Van Raden*. 71 T.C. at 1107. As we observed in *Van Raden*, period costs are easily allocable to more than one accounting period by dividing the total cost by the number of months over which the useful life of the asset created extends, whereas product costs do not lend themselves to such ease of allocation. See, for example, *Commissioner v. Boylston Market Ass'n, supra*; *Sandor v. Commissioner, supra*; *University Properties, Inc. v. Commissioner, supra*.

In this case, by contrast, the amounts prepaid under the drilling and service contracts were based on reasonable

estimates of the cost of drilling a given well to a specified depth. Obviously, neither the drilling contractor nor Amarex could know in advance of the actual drilling what conditions might be encountered or whether, after drilling had commenced, it would be feasible to continue. In some cases, the expense of drilling would exceed the estimate, and additional money would be required. In other cases, the cost would be less than the estimate, and part of the prepayment would be refunded, or, under some contracts, applied to a different well. Thus, the cost of a given well, although begun in 1973, could not be known with certainty as of the end of 1973.

We also note that the drilling partnership cannot satisfy the "going business" test of section 1.461–1(a)(3)(i), Income Tax Regs. That regulation provides, in relevant part, that "in a going business there are certain overlapping deductions. If these overlapping items do not materially distort income, they may be included in the years in which the taxpayer consistently takes them into account." Here, unlike the situation in *Van Raden*, we do not have an entity conducting its business on an ongoing annual basis, but rather a "one shot" drilling program sponsored by Amarex. Consequently, the element of consistency of prepayment cannot be present.

The payment vs. deposit discussion, *supra*, indicates that a part of the amount transferred in December 1973 (under the footage and daywork drilling contracts and the third-party well-servicing contracts) relating to wells spudded in 1973 constitutes payments and another part constitutes nondeductible deposits. Parts of these prepayments were beyond the unilateral reach of the drilling partnership as of the end of 1973. For example, the W. Cline prospect in Ohio was spudded on December 9, 1973. The drilling was completed on April 10, 1974. In 1973, the drilling partnership prepaid $6,464.25 for this well pursuant to a footage and daywork drilling contract. The drilling partnership could have recovered as refund some, but not all, of the prepaid amount if it canceled the work on December 31, 1973, because the well by that date had been spudded. The amount due the driller under the work-stoppage provision, had work been so canceled, was out of the drilling partnership's control as of the end of the year. Therefore this amount properly is classified as a payment. The remainder of the prepayment, however, was refundable as of the end of

1973. Consequently, this residual amount is a deposit, and is therefore not deductible.

Similarly, under the third-party well-servicing contracts, amounts earned as of the end of 1973 by the contractor were irretrievably out of the drilling partnership's pocket; but, the residual amount was refundable at that time. The amount earned in 1973 thus constitutes a payment in 1973, but the remainder is a nondeductible deposit.

We think that the petitioners are entitled to a 1973 deduction for the "payments" made under contracts relating to wells spudded in 1973 because the drilling partnership's income was not materially distorted by taking this amount as a deduction in 1973. The section 446(b) clear reflection determination is a question of fact which requires us to consider all relevant factors to determine if the partnership's income was materially distorted by deducting these payments in 1973. *Sandor v. Commissioner, supra.*

The fact that the "payments" include only the amounts earned by the vendor by the end of 1973 indicates that this part of the December 1973 prepayments was not prepayment for services to be performed after the end of that year. Instead, the drilling partnership received, in 1973, what it bargained for in exchange for these payments: the rig was on site and drilling and other services had been performed. Unlike the prepayments made under these contracts for post–1973 drilling and services, nonbusiness motivation for paying these amounts in 1973 is irrelevant. A cash basis taxpayer's income is clearly reflected if he deducts an expense in the same year as he pays for, and receives, his bargained for benefits, because the transaction is closed at that point. Accordingly, we hold that taking a 1973 deduction for these payments does not materially distort the drilling partnership's income. We note that this result does not have the effect of turning prepaid IDC into a period cost. It simply means that petitioners are entitled to a deduction for the amount to which the drilling partnership became committed as the drilling proceeded, thus effectively placing the partnership on the same pay-as-you-go basis as in the pay-as-you-go contracts for which respondent has allowed 1973 deductions.

The amounts of the prepaid contracts were estimated on a unit basis; that is to say, the cost of drilling a well was

estimated on a dollars-per-foot basis or per-diem basis; well servicing was estimated on a cost-per-unit-of-material-to-be-used or services-to-be-performed basis. Certain of the drilling contractors testified that they took the prepayment into income from time to time as actually earned. It therefore appears to be perfectly feasible to compute the amount of prepayment actually spent by the end of 1973 on the wells spudded during that year. However, since the parties have stipulated both the spud date and the drilling completion date on all of the wells drilled by the drilling partnership, we think it would be acceptable, for purposes of simplifying the Rule 155 computation *in this case*, merely to prorate the expenditures on a monthly basis. We emphasize, however, that we are not necessarily endorsing the application of such a computation in future cases.

*Amarex Funds well charges.*—On December 31, 1973, the drilling partnership prepaid $147,691.38 to Amarex Funds to supervise the drilling of the partnership's wells. The drilling partnership apparently had no power to compel a refund of this transfer. However, regardless of the results of the payment vs. deposit analysis, the partnership is not entitled to a 1973 deduction related to this transfer, because it materially distorts the partnership's income.

The facts of this prepayment indicate the material distortion which would occur if these amounts were deducted in 1973. The payment was entirely for services to be performed in 1974 and subsequent years. The amount was material in size, both on an absolute scale and relative to the total amount contributed to the partnership. We note, also, that this deduction was necessary in order for the individual investors to deduct the entire amount of their investment in the year of contribution. Also, as we held *supra*, the drilling partnership cannot satisfy the "going business" test of section 1.461–1(a)(3)(i), Income Tax Regs., due to the "one shot" nature of the drilling program.

Furthermore, there was no business purpose for prepaying the Amarex Funds well charges. As the drilling partnership operator, Amarex Funds was obligated by the drilling agreement to perform the supervisory services. Consequently, prepayment did not ensure availability of performance.

Petitioners argue that prepayment locked in a price for the services. With the benefit of hindsight, petitioners assert that

they paid less with the December 31, 1973, lump-sum transfer than they would have paid under the monthly charge outlined in the drilling agreement's accounting procedure. Petitioners' argument is unconvincing. The evidence indicates that the lump sum was determined as the best estimate, as of December 31, 1973, of the total future charges to be incurred under the accounting procedure. Therefore, petitioners' post hoc argument concerning a lock in of price is irrelevant in our determination of the partnership's motive for prepaying on December 31, 1973, because the record clearly indicates that the lump sum was calculated to maintain a price which had already been locked in.

Because Amarex Funds was obligated to provide the supervisory services at the same price, we discern no motive for prepayment other than to accelerate the tax deductions. Petitioners, of course, have the burden of proof, which we have described as being particularly heavy in section 446(b) cases. *Fort Howard Paper Co. v. Commissioner*, 49 T.C. 275, 284 (1967), citing *Commissioner v. Hansen*, 360 U.S. 446 (1959). We find that they have failed to sustain their burden of showing the error of respondent's determination that the drilling partnership's income was materially distorted by taking a 1973 deduction for the amounts transferred for the Amarex Funds well charges. We also note that because we have found that no business purpose existed for prepaying these charges, our statement in *Van Raden v. Commissioner, supra*, that "a substantial legitimate business purpose satisfies the distortion of income test" (71 T.C. at 1106), is of no help to petitioners in this case.

*Prepaid turnkey contracts.*—As previously indicated, some of the wells involved in this case were turnkey drilling contracts. The turnkey drilling contracts were different from the other prepaid contracts. Under the prepaid turnkey contracts, the driller agreed to drill a well to a certain depth for a certain price, irrespective of the time, materials, or expenses required to drill the well. The turnkey drilling contracts specified that "The well shall be drilled to the maximum depth specified * * * unless owner [the drilling partnership] shall elect to discontinue drilling and complete or abandon it at a lesser depth." Although the drilling partnership could stop the driller's work under the contract at any time, it could not get a

refund of any part of its prepayment. The detailed turnkey drilling contract had no provision for refunds. Also, one of the drillers who agreed to drill for the drilling partnership pursuant to a turnkey contract testified that prepayments would not be refunded if work was stopped. Instead, the prepaid amounts would be applied to another well to be drilled on a turnkey basis. Respondent introduced no evidence contradicting this testimony concerning the turnkey drilling contracts. In these circumstances, we find that the drilling partnership did not retain a unilateral power to recover its prepayment. It appears, therefore, that prepayments made pursuant to the turnkey drilling contracts are payments instead of nondeductible deposits.

Respondent, however, argues that the application of amounts prepaid for the canceled wells to different wells implies that the prepayments were nondeductible deposits. Respondent's argument is consistent with his position in the prepaid feed situation that substitution, during performance of a prepaid feed contract, of feed different from the type specified in the contract, makes the prepayment a mere deposit. Rev. Rul. 75–152, 1975–1 C.B. 144.

We disagree with respondent on this question. The deposit vs. payment inquiry properly focuses only on the unilateral power of a taxpayer to compel the return of the prepaid amounts. As we have previously stated, the deposit analysis prevents taxpayers from transferring money and taking a related deduction in year one and then recovering the money, thereby forfeiting the exchange upon which the deduction was based, in year two. In this case, substitution does not alter the fact that the drilling partnership is out of pocket the prepaid amount and will receive drilling services[25] in exchange for the prepayment.

Prior cases hold that mere substitution does not compel

---

[25]Respondent's argument concerning the power to substitute could be interpreted as an argument that the prepaid amounts do not constitute payments *for IDC*. We recognize that an abuse might occur if a taxpayer prepaid for IDC but reserved the power to substitute a capital item conceded not to be IDC. See, e.g., *Schenk v. Commissioner*, T.C. Memo. 1980–531, on appeal (5th Cir., Feb. 27, 1981) (prepayments for fertilizer cannot be characterized as a fertilizer payment when taxpayer retained power to substitute nonfertilizer items in subsequent tax year). However, that situation is not before us. Here, the drilling partnership's prepayments on the turnkey contracts were made only for drilling wells. If one well was canceled, then its prepaid amount was applied to drilling another well.

deposit treatment. In *Mann v. Commissioner*, 483 F.2d 673 (8th Cir. 1973), revg. a Memorandum Opinion of this Court, the contract allowed substitution of the types of feed to be used in the subsequent year. Despite the substitution provision, the Court allowed the deduction in the first year for prepayments because the taxpayer could not compel a refund. In *Owens v. Commissioner*, 64 T.C. 1, 17 (1975), affd. in part and revd. in part 568 F.2d 1233 (6th Cir. 1977), we adopted, for purposes of that case involving advance payments for livestock feed, the Circuit Court's statement in *Mann* that "the key to this question [of deposit vs. payment] is refundability." *Mann v. Commissioner, supra* at 678. Similarly, for purposes of advance payments of IDC, the application of the drilling partnership's prepaid amounts for canceled wells to different wells does not change our conclusion that the prepayments on turnkey drilling contracts properly are classified as payments instead of as deposits.

The remaining question is whether taking a 1973 deduction for amounts paid in 1973 on turnkey contracts materially distorts the drilling partnership's income. We find that such amounts clearly reflect income and thus are deductible in 1973.

We base this conclusion on the unique characteristics of the turnkey contract. An owner pays a significant premium to a driller to get a turnkey obligation, as contrasted with a footage and daywork contract. The turnkey contract obligates the driller to drill to the contract depth for a stated price, regardless of the time, materials, or expenses required to drill the well. The turnkey contract thus locks in prices. It also shifts the drilling risks from the owner to the driller. By signing and paying the turnkey obligation, the drilling partnership knew that, as far as it was concerned, the well was drilled. Therefore, we find that the partnership effectively got its bargained for benefit in the year of payment. Accordingly, cash basis taxpayers, like the drilling partnership, properly may deduct turnkey payments in the year of payment.

However, this holding must be made subject to a caveat in this case. The parties provided the Court with only a sample of the prepaid contracts involved in this case. They did not classify the wells drilled as wells drilled under prepaid footage and daywork contracts and wells drilled under prepaid turn-

key contracts. Some of the wells spudded in 1973 were drilled under turnkey contracts. Additionally, some of the wells spudded in 1974 were drilled under turnkey contracts for which 1973 deductions are allowable. From the record in this case, we cannot classify all the wells as to the types of contracts under which they were drilled. Accordingly, in connection with the Rule 155 computation, we will reopen the record for the limited purpose of permitting the parties to stipulate the specific wells drilled under prepaid turnkey contracts, and the wells drilled under prepaid footage and daywork contracts and third-party well-servicing contracts.

*Management fee.*—The drilling partnership transferred an additional $137,200 amount to Amarex Funds in 1973. The parties to this transaction called the transfer a "management fee." The amount of the fee represented 10 percent of the money subscribed to the drilling partnership. The drilling partnership deducted this 10-percent fee as a section 162 expense. In the deficiency notice, respondent disallowed the deduction because it was "not established that this amount constitutes an ordinary and necessary business expense deductible in this year."

Petitioners bear the burden of proving that the 10-percent fee was an ordinary and necessary business expenditure. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). The drilling partnership's designation of the payment as a fee for management services does not determine our decision on this issue. We must examine the nature of the services which Amarex Funds performed in exchange for the 10-percent fee to determine if the expenditure satisfies the requirements of section 162. *Cagle v. Commissioner*, 63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976).

We hold for respondent on this issue.[26] Petitioners intro-

---

[26]In the reply brief, petitioners assert that the issue of whether the "management fee" was in fact exchanged for goods or services, the cost of which represents an ordinary and necessary business expense, was not raised by respondent until his brief. Petitioners argue that the only question to be litigated is whether a management fee generally represents an ordinary and necessary business expense. Petitioners ask us not to consider respondent's substantiation argument because they assert that they were unable to present evidence on the issue as it was not raised at the correct time. Petitioners cite *Estate of Horvath v. Commissioner*, 59 T.C. 551 (1973), to support their position.

The rule of law expressed in *Horvath* does not help petitioners in this case. Whether the 10-percent fee was paid for items, the cost of which is a sec. 162 expense, was placed in

duced no evidence to identify the goods or services which the drilling partnership received in exchange for the 10-percent fee. The absence of direct evidence concerning the nature of the expenditure hurts petitioners who must sustain the burden of proof on this issue. See *Cheroff v. Commissioner*, T.C. Memo. 1980–125.

Examination of the circumstances in which Amarex Funds provided services to the drilling partnership fails to convince us that the management fee was a deductible expense. Amarex Funds served as the drilling partnership operator and as the program partnership manager. In their brief, petitioners argue that the 10-percent fee was paid to Amarex Funds in exchange for its management of the drilling operation. We note again that no direct evidence of such a bargain was offered at trial. Also, the drilling well charges, as we found previously, constituted the means by which the drilling partnership compensated Amarex Funds for its services. On these facts, we are not convinced that the 10-percent fee was paid for managing the drilling activity.

According to the accounting procedure contained in the drilling agreement, the 10-percent fee was to be paid to Amarex Funds, in its capacity as the program partnership manager, as compensation for managing the activities of the program partnership. The program partnership manager had broad authority to control the operations of the program partnership. However, the drilling agreement specifically prohibited the program partnership from exercising any right

---

controversy by respondent's notice of deficiency. The notice, in its pertinent part, states: "the deduction claimed for management fees by the [drilling partnership] is not allowable because you have not established that this amount constitues an ordinary and necessary business expense deductible in this year."

This statement in the deficiency notice plainly calls for substantiation of the claimed expenses. It does not merely assert that management fees are not ordinary and necessary expenses in the drilling partnership's business.

In fact, petitioners' lawyer acknowledged at trial that the issue before this Court was whether the drilling partnership in fact received management services or other sec. 162 items when he said: "the government's whole position is that we haven't proven that it's an ordinary and necessary business expense *or that we got anything for it.*" Transcript at 84. Emphasis added.

On these facts, petitioners have not convinced us that the substantiation issue was raised in an untimely manner. Petitioners must bear the consequences of the record which they created.

to participate in the management or control of the drilling activity. Therefore, the program partnership basically was a passive conduit which funneled investors' subscriptions to the drilling partnership and channeled the drilling partnership's losses or gains to the investors.

The program partnership manager's services thus were limited to collecting subscriptions from the individual investors, allocating the investments to the drilling partnership, keeping the books, and issuing annual reports and tax returns. It is unlikely that a $137,200 fee would be paid for such minor administrative services. *Kimmelman v. Commissioner*, 72 T.C. 294, 305 (1979). The unlikelihood of such an exchange is particularly high in this case because the program partnership manager was reimbursed for all expenses, including overhead, incurred in performing these administrative tasks. In fact, the drilling partnership paid Amarex Funds $6,262 in 1973 for these expenses. On these facts, petitioners failed to convince us that the 10-percent fee was paid for managing the program partnership.

The absence of direct evidence of the nature of the 10-percent fee, and the circumstances in this case which indicate that it is unlikely that the fee was paid to Amarex Funds in exchange for section 162 services, compel the conclusion that petitioners failed to satisfy their burden of proving that the 10-percent fee was an ordinary and necessary expense.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *Chief Judge*, concurring: I fully agree with the majority opinion. I do not believe that anything in my concurring opinion in *Van Raden* implies that the approach embodied in Rev. Rul. 75–152, 1975–1 C.B. 144, or in the cattlefeed cases, generally, could not or should not be applied in other situations. I merely emphasized in that opinion that cattlefeed cases were sui generis, but that was not intended to imply that none of the rationale in those cases could be utilized in other situations.

I believe it important that there be no misunderstanding as

to the Court's position. Payments for personal services clearly fall within the definition of IDC. See sec. 1.612–4(a), Income Tax Regs. In holding, as the majority does in this case, that they were properly allocable by a cash basis taxpayer to the period of the rendition of the services, it is important to understand that this action is taken in this case in the context of a situation where the provider of the services was already committed to render such services without any advance payment and such payment was made by the petitioner without any contractual requirement or business purpose to do so. Depending upon the circumstances, such an allocation may be inappropriate where the advance payment is a condition for a commitment to render personal services imposed in good faith, and for good reason, by the person who is to perform the services. See *Bonaire Development Co. v. Commissioner*, 679 F.2d 159 (9th Cir. 1982), affg. 76 T.C. 789 (1981). Indeed, the contrast between the majority's treatment of the advance payments in connection with the turnkey drilling contracts and their treatment of the Amarex Funds well charges clearly indicates the distinction which I am suggesting.

IRWIN AND WHITAKER, *JJ.*, agree with this concurring opinion.

GOFFE, *J.*, concurring in part and dissenting in part: I concur with the result reached by the majority on the management fee issue. I concur only with the result reached by the majority on the prepaid turnkey drilling contract issue. I concur only with the result reached by the majority in disallowing portions of the prepaid footage and daywork contracts and portions of the prepaid third-party well-servicing contracts. I dissent from the holding of the majority with respect to the Amarex Funds drilling well charges.

In order to reach the results upon which I concur with the majority, I would not apply the business purpose test, nor the distortion of income test, and instead of applying the deposit vs. payment test of the prepaid cattlefeed cases, I would ascertain whether "payment" occurred independently of the "deposit" cattlefeed cases.

Instead of explaining my disagreements with the majority

by issue, it is more meaningful to discuss the concepts applied by the majority which, in my view, are not applicable and the concepts which are applicable but which have been misapplied by the majority.

My first point of departure from the majority is its conclusion that the issues should be examined under Rev. Rul. 75–152, 1975–1 C.B. 144, which involves prepaid cattlefeed expense. No reason is given for such a conclusion except that respondent's argument tracks the three-part test of that ruling. Petitioners, on brief, vehemently disagree with the conclusion that analysis under the cattlefeed ruling is appropriate and, upon careful analysis, I agree with petitioners. Although the grounds for disallowance in the statutory notice of deficiency in this case track the three-part test of Rev. Rul. 75–152, the similarity ends there.

Rev. Rul. 75–152 involves only prepaid cattlefeed, a commodity that is consumed in the process of fattening cattle for sale. Prepaid IDC involve the cost of (1) acquiring a capital asset with a useful life extending over a period of more than 1 taxable year, i.e., an oil or gas well, or (2) the subsequent writeoff of a business loss (dry hole). Cattlefeed is an essential ingredient of the business of fattening cattle for sale. The payment of IDC is not relevant to the production of income until the well is completed as a producer or abandoned as a dry hole.

We examined the prepaid cattlefeed issue in *Van Raden v. Commissioner*, 71 T.C. 1083 (1979), affd. 650 F.2d 1046 (9th Cir. 1981), in the manner set forth in Rev. Rul. 75–152, because respondent's position was consistent with that ruling and the ruling dealt specifically with the issue involved (71 T.C. 1096). Nevertheless, five of the judges of this Court concurred only in the result and pointed out that respondent's position was nothing more than an attempt to require farmers on the cash method of accounting to inventory cattlefeed. Concurring opinion of Judge Tannenwald, 71 T.C. at 1111.

The class of taxpayers involved in Rev. Rul. 75–152 (farmers on the cash method of accounting) is allowed special accounting concessions in the Treasury regulations. Likewise, cash basis taxpayers who pay IDC are accorded a special benefit in the Code and regulations by being given the option to expense IDC. Such concessions are, however, granted to these different

classes of taxpayers for totally different reasons. Farmers have enjoyed the historical concession because of the nature of the farming business. *Van Raden v. Commissioner, supra* at 1106. Taxpayers who pay IDC are given the option to deduct an otherwise capital expenditure because of the great risk involved in exploring for oil and gas. *Standard Oil Co. (Ind.) v. Commissioner*, 77 T.C. 349, 397 (1981), on appeal (7th Cir., Mar. 1, 1982); *Sun Co. v. Commissioner*, 677 F.2d 294, 299 (3d Cir. 1982), affg. 74 T.C. 1481, 1510 (1980); *Gates Rubber Co. v. Commissioner*, 74 T.C. 1456, 1477 (1980), on appeal (10th Cir., May 5, 1981). This distinction between feed costs and capital expenditures is most effectively pointed out in the concurring opinion of Judge Tannenwald in *Van Raden v. Commissioner, supra* at 1110.

In view of the distinctions pointed out above, the issues here should not be examined in the context of Rev. Rul. 75–152. It does not constitute authority. It may well be that the Commissioner would prefer scrutiny under Rev. Rul. 75–152, rather than focus upon the case law and published and private rulings which he has issued on the precise question involved here, because his position in this case is inconsistent with those rulings.

Petitioners rightfully rely upon the announced position of the Commissioner reflected in his rulings. A brief description of the history of the case law and the Commissioner's position on prepaid IDC is in order.

The scenario commenced when the Commissioner issued Rev. Rul. 170, 1953–2 C.B. 141, in which he held that a cash basis taxpayer could deduct IDC, which he had paid, only in the taxable year in which the drilling and development services were rendered to him. That ruling was requested in connection with the tax liabilities of Edwin W. Pauley and Barbara Jean Pauley, who later filed refund suits in the District Court. The court held in favor of the taxpayers, contrary to Rev. Rul. 170. *Pauley v. United States*, an unreported case (S.D. Cal. 1963, 111 AFTR 2d 955, 63–1 USTC par. 9280). Edwin Pauley paid the IDC to Pike Drilling Co., prior to which time Pike had no business dealings with Pauley. Pike wanted some assurance that Pauley would pay for drilling the well. Pike generally needed cash for conducting its drilling operations. As a result of negotiations, Pauley agreed

to pay Pike $95,000 on December 31, 1947, when the drilling contract was executed. The well was not "spudded in" until January 13, 1948.

The court held that the work performed by Pike was not personal services and that the payment of $95,000 was deductible in 1947. The majority in the instant case, at page 36 of its opinion, characterizes the holding in *Pauley* to be based upon "the finding that impelling business necessity motivated the prepaid IDC." I can find nothing in the opinion in *Pauley* upon which to base such a conclusion. If an "impelling business necessity" were present, it was not the business necessity of Pauley, who prepaid the IDC but, instead, that of Pike, who wanted to be sure that Pauley would pay at all. Subsequent to the *Pauley* decision, the Commissioner issued Rev. Rul. 71–252, 1971–1 C.B. 146, in which he followed *Pauley* and expressly revoked Rev. Rul. 170.

In Rev. Rul. 71–252, the Commissioner recited a set of facts similar to those in *Pauley* and pointed out that as a bona fide transaction, the taxpayer was obligated to pay the IDC at the times specified in the drilling contract. The Commissioner held that the deduction for prepaid IDC was allowable. There was no mention of distortion of income. On December 27, 1979, the Commissioner issued Letter Ruling 8012060 in which he held that if the IDC were prepaid pursuant to a binding contract, they would be deductible in the year of payment by a cash basis taxpayer regardless of whether the driller performed any work under the turnkey drilling contract in the year of prepayment. No mention was made of the distortion of income test. As late as March 31, 1982, the Commissioner issued Letter Ruling 8226135 to an accrual basis taxpayer, under facts whereby the prepayment was made to assure the drilling contractor adequate funds. That ruling held the prepaid IDC to be deductible in the year of payment, without mention of the distortion of income test.

In Rev. Rul. 80–71, 1980–1 C.B. 106, the Commissioner ruled that certain prepayments of IDC were not allowable. The payments were not required under the contracts. The Commissioner examined the question under the provisions of sections 461 and 446(b) and concluded that if the taxpayer were permitted to deduct the prepaid IDC, it would result in a material distortion of income. In that ruling, the Commission-

er distinguished *Pauley* and Rev. Rul. 71–252 on the grounds that the prepayment was occasioned by the driller's concern over Pauley's willingness and ability to pay at a later date. The ruling recognizes that IDC are admittedly capital in nature, but the ruling does not say whether the taxpayer can elect to deduct the IDC in the taxable year in which drilling services are performed or whether such IDC must be capitalized.

The most recent decision on the subject is *Dillingham v. Commissioner*, an unreported case (W.D. Okla. 1981, 48 AFTR 2d 81–5815, 81–2 USTC par. 9601). The court found that the prepayment of IDC was required for a legitimate business purpose, and the transaction was not a sham merely to permit the taxpayer to control the timing of the deduction. The court concluded that the taxpayers were entitled to rely upon Rev. Rul. 71–252, *supra*, and *Pauley v. United States, supra*, and the IDC prepayments were deductible in the year paid by taxpayers on the cash or accrual method of accounting.

Admittedly, rulings are not binding upon the Commissioner. In section 601.201(a)(5) of the Statement of Procedural Rules, however, the Commissioner describes a revenue ruling as the official interpretation by the Internal Revenue Service, published for the information and guidance of taxpayers *and Internal Revenue Service officials*. A revenue ruling is simply the contention of one of the parties to the litigation. *Estate of Lang v. Commissioner*, 64 T.C. 404 (1975), affd. in part and revd. in part 613 F.2d 770 (9th Cir. 1980).

The majority, in the instant case, merely assumes that the tests in the cattlefeed ruling (Rev. Rul. 75–152) apply. There is no authority to apply such tests except those announced by the Commissioner in his rulings. I conclude that there are some basic flaws in such an analysis.

The first and third tests, i.e., business purpose and distortion of income, are intertwined. Although the statutory notice of deficiency in this case is not a model of clarity, it disallows the deduction for prepaid IDC as a distortion of income. "Distortion of income" is generally accepted to mean that the Commissioner has determined that the taxpayer's method of accounting does not clearly reflect income; therefore, the Commissioner, in his discretion, has altered that method to more clearly reflect income under section 446(b). In *Van Raden v. Commissioner*, 71 T.C. 1083 (1979), affd. 650 F.2d

1046 (9th Cir. 1981), we held that the presence of a substantial business purpose satisfied the distortion of income test. It is important to reiterate here the logic of this relationship from pages 1105 and 1106 of that opinion (71 T.C.):

Accounting methods and the nature of the business are inextricable. "A method of accounting which reflects the consistent application of generally accepted accounting principles *in a particular trade or business* in accordance with *accepted conditions or practices in that trade or business* will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year." Sec. 1.446–1(a)(2), Income Tax Regs. (Emphasis added.) Examples of accounting methods which are dictated by the particular trade or business include those where the production, purchase, or sale of merchandise is an income-producing factor, sec. 1.446–1(a)(4)(i), Income Tax Regs.; a taxpayer whose sole source of income is wages need not keep formal books in order to have an accounting method, sec. 1.446–1(b)(2), Income Tax Regs.; crop method of accounting for farmers, sec. 1.446–1(c)(1)(iii), Income Tax Regs.; if the taxpayer is engaged in more than one trade or business, a different method of accounting may be used for each trade or business if it clearly reflects income, sec. 1.446–1(d)(1), Income Tax Regs.; income from long-term contracts may be included under either the percentage of completion method or the completed contract method, sec. 1.451–3(a), Income Tax Regs.; dealers in personal property who regularly sell on the installment plan may report on the installment method of accounting, sec. 1.453–1(a), Income Tax Regs.

Because the method of accounting and the nature of the trade or business are so interdependent, we conclude that the distortion of income must not be examined in a vacuum but in light of the business practice or business activities which give rise to the transaction which the Commissioner has determined must be accorded a different accounting treatment. For example, material distortions of income may occur if the sales force of a business is more successful in December than in January, yet such a distortion would not require adjustment to clearly reflect income because the distortion resulted from the business activity itself. Should the result be different if the taxpayer purchases a year's supply of its primary cost item at its lowest cost consistently from year to year? We do not think so. In short, a substantial legitimate business purpose satisfies the distortion of income test. We recognized this implicitly in *Sandor v. Commissioner, supra.* See *Stokes v. Commissioner*, 22 T.C. 415 (1954); *Maple Leaf Farms, Inc. v. Commissioner*, 64 T.C. 438 (1975); *Hi-Plains Enterprises, Inc. v. Commissioner*, 60 T.C. 158 (1973), affd. 496 F.2d 520 (10th Cir. 1974).

The majority, at pages 25–26 of its opinion, implies that petitioners concede that the business purpose test should be applied. That is not petitioners' position. They contend that they are entitled to deduct prepaid IDC under the rationale of *Pauley v. United States, supra.* As an alternative, they argue

that a substantial business purpose existed for prepayment of IDC.

I disagree with the majority that section 446(b) applies to IDC. Under section 446(a), taxable income is computed under the method of accounting employed by the taxpayer in maintaining his books. Section 446(b) permits the Secretary to prescribe another method if, in the Secretary's opinion, the taxpayer's method does not clearly reflect income. In my view, this authority to change the method of accounting from that utilized by the taxpayer does not extend to the deduction for intangible drilling and development costs (IDC) which the taxpayer may elect to deduct under section 263(c).

Expenditures for IDC are admittedly capital in nature. They are listed in subsection (c) of section 263 which is entitled "Capital Expenditures." They are likewise described in section 1.263, Income Tax Regs., as being capital expenditures. *Standard Oil Co. (Ind.) v. Commissioner*, 68 T.C. 325, 346 (1977); *Gates Rubber Co. v. Commissioner*, 74 T.C. 1456, 1474 (1980), on appeal (10th Cir., May 5, 1981); *Sun Co. v. Commissioner*, 677 F.2d 296, 297 (3d Cir. 1982), affg. 74 T.C. 1481, 1507 (1981). In *F.H.E. Oil Co. v. Commissioner*, 149 F.2d 238 (5th Cir. 1945), the Circuit Court of Appeals held that IDC were capital in nature. That holding gave rise to H.R. Con. Res. 50, 79th Cong., 1st Sess., 59 Stat. 844 (1945), which recognized and approved Treasury regulations granting the option to deduct IDC. *Standard Oil Co. (Ind.) v. Commissioner*, 68 T.C. at 347.

Section 263(c), by its own terms, codifies House Concurrent Resolution 50 and directs the Secretary to prescribe regulations permitting the current deduction of IDC which correspond to regulations which previously granted the option.

An analogy can be drawn between IDC and research and experimental expenditures. Section 263(a)(1)(B) explicitly recognizes that research and experimental expenditures are capital in nature, but provides that section 263 shall not apply to such expenditures which are deductible under section 174. In his recent treatise, Federal Taxation of Income, Estates and Gifts (1981), Professor Bittker describes the cases which construe the power of the Commissioner to change the taxpayer's method of accounting under section 446(b). At vol. 4, pages 105–118 (par. 105.1.6) of his treatise, Professor Bittker makes the following observation:

> These judicial testimonials to the broad powers of the IRS must be qualified in one fundamental respect: An accounting method that is explicitly authorized or prescribed by Congress cannot be rejected even if the IRS, on sober evaluation of its impact, concludes that it does not clearly reflect income. The preemptive character of such statutory provisions as IRC [sec.] 174, permitting taxpayers to deduct research and experimental expenditures even if income would be more clearly reflected by capitalizing these outlays and depreciating them over their useful lives, is obvious. [Fn. refs. omitted.]

I agree with Professor Bittker as to section 174 (expenditures for research and experimentation) and conclude that such reasoning likewise applies to IDC deductible under section 263(c) and the regulations. Section 263(c), like section 174, preempts section 446(b) and precludes the Commissioner from changing the timing of IDC as deductions. The only way that the accounting treatment for IDC can clearly reflect income is to treat such capital items in the traditional manner, i.e., capitalize them and permit their amortization over the estimated useful life of the asset (the oil or gas well). This treatment is, however, contrary to section 263(c) which permits the taxpayer to deduct the entire capital cost as a current deduction. Admittedly, exercise of the option to deduct IDC results in a distortion of income, but that distortion has been authorized by Congress in section 263(c).

The majority describes IDC as "product" costs on page 41 of its opinion. As explained above, IDC have consistently been held to be capital expenditures. The product costs vs. periodic costs distinction which is found in the prepaid cattlefeed cases has no application here.

I have been unable to find any authority whereby the Commissioner was sustained for changing the date for beginning the amortization of a capital asset to more clearly reflect income. Such authority obviously does not exist because the capital expenditure is made at a point in time which business judgment demands, not some artificial future date.

The holding of the majority also contravenes clear congressional intent encouraging the exploration for oil and gas.

We pointed out the direct relationship between the option to expense IDC and risk in *Standard Oil Co. (Ind.) v. Commissioner*, 77 T.C. 349, 397 (1981), with the following:

> Courts have long recognized that the allowability of the deduction of IDC goes hand-in-hand with the taking of risks:

"The argumentative justification for liberality in taxation of oil and gas is that such liberality encourages and emboldens the fiscally timid to exploit the hidden resource. It rewards the risk-taker. * * * [*United States v. Cocke*, 399 F.2d 433, 452 (5th Cir. 1968).]

"The regulations do not comtemplate that investors * * * [can be] allowed a deduction for intangible drilling costs without assuming the risk of the unknown result of the drilling. * * * [*Haass v. Commissioner*, 55 T.C. 43, 50 (1970).]

"Thus it is clear that risk and IDC are inextricably related. [*Standard Oil Co. (Indiana) v. Commissioner*, 68 T.C. at 350.]

"The taking of risks has always been inextricably related to the availability of the IDC option. [*Gates Rubber Co. v. Commissioner*, 74 T.C. at 1477; *Sun Co. v. Commissioner*, 74 T.C. at 1510.]"

The Court of Appeals in *Sun Co. v. Commissioner*, 677 F.d 294 (3d Cir. 1982), agrees with our conclusion.

In 1977, the tax-preference provisions were modified to reduce the IDC subject to such treatment to the excess over the net income from oil and gas. The following discussion accompanied the Senate floor amendment which modified the law:

In the period 1969 through 1973, independent producers in the United States drilled 9 out of 10 exploratory—wildcat—wells, found 54 percent of the oil and gas discovered, and accounted for 75 percent of the "significant" petroleum discoveries as defined by the American Association of Petroleum Geologists.

Drilling is an extremely high risk business. Only one exploratory well in nine produces anything. Eight out of nine exploratory wells are dry holes. In addition, at least 20 percent of developmental wells are dry holes. Due to the extreme risk, private foundations are not allowed under Federal law to invest in oil and gas activities. In addition, trust funds of widows or orphans cannot be invested in drilling, again because of the extreme risk of these investments. In order to prevent increasing dependence on overseas oil, our tax laws must not discourage risk taking in the oil and gas business.

The 15-percent penalty tax on intangible drilling costs discourages active wildcatting which is so important to our energy needs. [123 Cong. Rec. S6701–6702 (daily ed. Apr. 28, 1977).]

The purpose of Congress—to encourage risk-taking by permitting the immediate deduction of IDC—is thwarted by the holding of the majority. The majority postpones the deduction to some unspecified date when services are performed or the well is completed. At the present time, the average time of completion of an oil or gas well is 15 months. It is not uncommon for completion to require 18 months and deeper wells require up to 3 to 4 years to complete. The

postponement of the deduction to the risk-taker who pays IDC in cash makes the investment in such a highly speculative venture even less attractive and will have the effect of "drying up" the very venture capital which Congress has sought to encourage by enactment of section 263(c).

It is fundamental that the IDC provisions are to be construed liberally. *Exxon Corp. v. United States*, 212 Ct. Cl. 258, 547 F.2d 548, 555 (1976); *Standard Oil Co. (Ind.) v. Commissioner*, 68 T.C. at 345; *Gates Rubber Co. v. Commissioner, supra* at 1475; *Sun Co. v. Commissioner, supra* at 1508. The courts should not be niggardly in their approach to the IDC regulations, as the IDC option is viewed by Congress as an incentive to oil and gas prospecting and exploration, a continuing objective of national importance. *Exxon Corp. v. United States*, 212 Ct. Cl. at 269–271, 547 F.2d at 555; *Standard Oil Co. (Ind.) v. Commissioner*, 77 T.C. 349, 387 (1981). The majority adopts just such an approach by requiring postponement of the deduction until the drilling services are performed or until the well is completed, rather than permitting a full deduction when the IDC are paid.

The operator incurs the risk when he pays the IDC, not when some services are performed. The risk is undertaken when the money is paid. It is then that the payment has been made for the acquisition of the capital asset, i.e., the oil or gas well. This is the payment which Congress sought to encourage.

If I were to concede that section 446(b) applied to IDC, which I do not, I would hold that the Commissioner has abused his discretion in applying section 446(b), and I conclude that the majority has misapplied the distortion of income test in this case. The majority never really explains how the income of the partnership is distorted by allowing the prepaid IDC as deductions when paid by a taxpayer on the cash method of accounting.

It is difficult to understand why the Commissioner continues to issue rulings in which he allows taxpayers to deduct IDC without mention of distortion of income while, at the same time, he asks this Court to delve into the murky distortion of income test.

The majority reaches different results as to the different kinds of contracts which give rise to IDC. As to the footage and daywork contracts and the well-servicing contracts, the major-

ity holds that the amounts deducted were deposits and that petitioners failed to prove a business purpose. The majority, however, allows a portion thereof for wells spudded in 1973 because the funds were beyond the control of the partnership and there was no material distortion of income. The majority finds no distortion in prepayment of the IDC on turnkey contracts. The majority disallows all of the IDC paid for Amarex drilling well charges because income is materially distorted.

In his concurring opinion in *Van Raden v. Commissioner*, 71 T.C. 1083 (1979), affd. 650 F.2d 1046 (9th Cir. 1981), Judge Tannenwald suggests that the historical concession granted to farmers to choose between a cash expenditures and an inventory method of accounting satisfies the clear reflection of income requirement of section 446(b).

In *Frysinger v. Commissioner*, 645 F.2d 523 (5th Cir. 1981), affg. T.C. Memo. 1980–89, the Court of Appeals approved and applied our opinion in *Van Raden v. Commissioner, supra*, and also drew the distinction which I have attempted to articulate here (p. 528):

> Rather we hold that where the taxpayer is a farmer covered by the special provisions allowing farmers to take current deductions for feed expenses, where the prepayment is for a business purpose and not merely tax avoidance, and where it is in line with normal business practice and not unreasonable, the Commissioner cannot use his discretionary authority to vitiate the benefits granted the taxpayer by his own regulations merely because the taxpayer's method may otherwise result in a distortion of income.

The Court will not approve the Commissioner's method of accounting unless it clearly reflects income. *Reynolds Cattle Co. v. Commissioner*, 31 B.T.A. 206 (1934). In changing the method of accounting of the taxpayer, the Commissioner is given much discretion. But he may not capriciously or arbitrarily sacrifice the facts of the case to theory or fiction. *Robert Hyams Coal Co. v. United States*, 26 F.2d 805 (E.D. La. 1928). See *Bay State Gas Co. v. Commissioner*, 75 T.C. 410, 413 (1980); *Magnon v. Commissioner*, 73 T.C. 980, 1004 (1980); and *Garth v. Commissioner*, 56 T.C. 610 (1971), where we stated at page 618:

> It is well settled that the Commissioner has broad powers in determining whether the accounting method used by a taxpayer does clearly reflect

income, *Commissioner v. Hansen*, 360 U.S. 446, 447; but this is not to say that the Commissioner has authority to force a taxpayer to change from a method of accounting which does "clearly reflect income" to a method which in the Commissioner's opinion more clearly reflects income. It is not the province of the Court to weigh and determine the relative merits of systems of accounting. *Brown v. Helvering*, 291 U.S. 193 (1935).[5]

---

[5] See *Koebig & Koebig, Inc. v. Commissioner*, T.C. Memo. 1964-32.

In my view, the quotation from *Garth v. Commissioner, supra*, is applicable here. The majority has utterly failed to show how the Commissioner's accounting method which the majority adopts with respect to some of the IDC more clearly reflects income than the accounting method employed by the partnership, i.e., deduct when paid (taxpayer on cash method of accounting).

The majority seems to hold that IDC are deductible by a taxpayer on the cash method of accounting as the services in drilling the well are performed. This holding is contrary to *Pauley v. United States*, an unreported case (S.D. Cal. 1963, 11 AFTR 2d 955, 63-1 USTC par. 9280), wherein the Court held that IDC were not paid for personal services. As we pointed out above, the nature of the oil business is such that only the completion of the well as either a producer or its abandonment as a dry hole is of significance.

On page 43 of its opinion, the majority advances the following new and novel principle about clearly reflecting the income of a taxpayer who utilizes the cash method of accounting: "A cash basis taxpayer's income is clearly reflected if he deducts as an expense in the same year as he pays for and receives his bargained for benefits because the transaction is closed at that point." This new principle will affect a host of deductions traditionally allowed to a taxpayer on the cash method when he makes the payment. For example, if a taxpayer on the cash method paid a lawyer a retainer fee to represent him, he would be required to pro rate that fee over the period that the lawyer performed the services. In any event, that principle is contrary to *Pauley v. United States, supra*, in which it was held that drilling the well was not the rendition of personal services. Even the Commissioner follows *Pauley* in all of his published and private rulings. The

Commissioner has not asked us to hold that IDC are payments for services. As explained above, IDC are capital expenditures.

The majority points out on page 44 of its opinion that the drillers took the prepayments of IDC into income from time to time as actually earned. This is immaterial. How could the accounting treatment by the recipients of the IDC be binding on petitioners? Moreover, it is not pointed out, nor does the record disclose, whether the drillers were on the cash or accrual method of accounting.

On pages 44–45 of its opinion, the majority points out that it was necessary to prepay the Amarex Funds drilling well charges in 1973 to permit the investors to deduct the cost of their investment. This Court has never before held that the distortion of income test would be applied at the partner level. Instead, we have consistently held that such test would be applied at the partnership level, beginning with *Resnik v. Commissioner*, 66 T.C. 74, 80 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977), and continuing with, e.g., *Van Raden v. Commissioner*, 71 T.C. 1083, 1103 (1979), affd. 650 F.2d 1046 (9th Cir. 1981); *Davis v. Commissioner*, 74 T.C. 881, 906 (1980), on appeal (6th Cir., Feb. 17, 1981); *Stradlings Building Materials, Inc. v. Commissioner*, 76 T.C. 84, 86 (1981); *Brannen v. Commissioner*, 78 T.C. 471, 504–505 (1982).[1]

On pages 27–28 of its opinion, the majority holds that there is nothing in the regulations which deals with the timing of the election to expense IDC. I disagree. Section 1.612–4(d), Income Tax Regs., provides:

*Manner of making election.* The option granted in paragraph (a) of this section to charge intangible drilling and development costs to expense may be exercised by claiming intangible drilling and development costs as a deduction on the taxpayer's return for the first taxable year in which the taxpayer pays or incurs such costs; no formal statement is necessary. If the taxpayer fails to deduct such costs as expenses in such return, he shall be deemed to have elected to recover such costs through depletion to the extent that they are not represented by physical property, and through depreciation to the extent that they are represented by physical property.

Section 1.612–4(e), Income Tax Regs., provides in part as follows: "Any taxpayer * * * must exercise the option granted in paragraph (a) of this section in the return for the first

---

[1]*Cheroff v. Commissioner*, T.C. Memo. 1980–125.

taxable year in which the taxpayer pays or incurs such expenditures."

In my view, the regulations approve the deduction of IDC when paid. As explained above, the regulations have been approved by Congress. At the very least, if the taxpayer did not deduct them in the year paid he would, under the regulations quoted above, be deemed to have waived his election to deduct them and would be required to recover IDC through depletion and depreciation, contrary to the intent of Congress and section 263(c).

The majority applies the "deposit" theory to IDC which, heretofore, has been applied only to prepaid cattlefeed cases. In *Owens v. Commissioner*, 64 T.C. 1, 17 (1975), we observed as follows:

> Moreover, in approaching our decision, we assume, for the purposes of this case, that the "tax treatment of advance payments for livestock feed" is a sui generis proposition to which principles governing other types of advance payment do not apply. See *Mann v. Commissioner*, 483 F.2d at 676. In so doing, we do not imply that such principles might not be applied in other cases involving livestock feed.

The United States Court of Appeals for the Eighth Circuit, to which an appeal in the instant case would lie, made the following observation as to prepaid expenses in *Mann v. Commissioner*, 483 F.2d 673, 676 (8th Cir. 1973):

> There is clearly no common thread or governing principle which rationalizes and renders predictable the results concerning deductibility of advance payments in general. However, special theories and practices have developed which govern the tax treatment of advance payments for livestock feed.

Instead of delving into the morass of the case law covering the "deposit" theory in which we have not been very successful on appeal, it would be preferable to decide such a question on the basis of whether or not the taxpayers had "paid" the IDC, which was the test recently applied to IDC in *Burns v. Commissioner*, 78 T.C. 185 (1982). The majority holds that there was no business purpose for the prepayment of IDC pursuant to footage and daywork contracts. This is inconsistent with the holding of the Commissioner in Letter Ruling 8012060 dated December 27, 1979, wherein he allowed a deduction for the amount of a reasonable estimate of the IDC that will ultimately become due upon completion of the well.

As the foregoing demonstrates, I would analyze the issues of

this case in an entirely different manner than does the majority. The application of my analysis to the facts involved would yield the following results: allowance of none of the management fees; allowance of all of the prepaid IDC pursuant to the turnkey and the Amarex Funds drilling well charges; and allowance of portions of the prepaid IDC pursuant to the footage and daywork contracts and third-party well-servicing contracts.

DAWSON, WILES, and KÖRNER, *JJ.,* agree with this concurring and dissenting opinion.