DAVID J. SCHLOEGL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schloegl v. Commissioner
Docket No. 23511-82.
United States Tax Court
T.C. Memo 1986-440; 1986 Tax Ct. Memo LEXIS 170; 52 T.C.M. (CCH) 487; T.C.M. (RIA) 86440; September 15, 1986. David J. Schloegl, pro se. Mark Pridgeon and Mary E. Pierce, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a timely statutory notice of deficiency dated July 19, 1982, respondent determined deficiencies in petitioner's Federal income tax and self-employment tax liabilities as follows: Year
Deficiencies
1977
$999.00
1978
7,020.08
1979
8,674.37
Following concessions, the primary issues remaining for decision are: (1) Whether petitioner properly may use the completed contract method of accounting to reflect income received in 1978 and 1979; (2) whether petitioner may deduct expenses allegedly incurred in connection with his construction business in excess of those allowed by respondent; and (3) whether petitioner is entitled to an investment tax credit with respect to certain leased property. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, David J. Schloegl, was a resident of St. Paul, Minnesota, at the time of filing the petition herein. Petitioner timely filed Federal income *172 tax returns (Forms 1040) for 1977, 1978, and 1979. During the years in issue, petitioner was employed by Knox Lumber Company and also operated as a sole proprietor a construction business. The income and expenses of the construction business were reported on the cash method of accounting. In November of 1978, petitioner, on behalf of his construction business, entered into a contract to produce 4,000 steel brackets for Knox Lumber Company. Under the contract he was to receive an advance payment of $7,100 in 1978. Petitioner produced approximately 250 brackets per week and completed the contract in 1979. Petitioner did not include the $7,100 advance payment in his 1978 Federal income tax return. Instead, he included all the income he earned under the 1978 contract with Knox Lumber Company in his 1979 Federal income tax return using the completed contract method of accounting. In November of 1979, on behalf of his construction business, petitioner entered into a second contract with Knox Lumber Company to produce another 4,000 steel brackets. He received in 1979 an advance payment under this contract of $24,040. Petitioner did not include the $24,040 advance payment in his 1979 *173 Federal income tax return. Petitioner completed the second contract in 1980. Petitioner did not file a Federal income tax return for 1980. Petitioner claimed various expenses as Schedule C deductions on his Federal income tax returns for 1977, 1978, and 1979, which expenses allegedly were incurred during those years in connection with petitioner's construction business. Respondent disallowed many of the claimed expenses for lack of substantiation and because petitioner did not establish that the expenses were related to or incurred in connection with his business. On his 1977, 1978, and 1979 returns, petitioner deducted as rent amounts allegedly paid to Franklin Auto Body, Inc., for the use of a building out of which petitioner conducted his construction business. Petitioner had occupied the property since 1975 under an oral agreement with Robert C. Wicker ("Wicker"), president of Franklin Auto Body. Petitioner, however, was not obligated under the agreement to pay Franklin Auto Body any stated monthly or yearly rent for use of the property. Petitioner performed repairs on the building in connection with the use of the building by his construction company but apparently the *174 repairs were not based on any obligation owed to Wicker to make repairs to the building. Contrary to what is implied by its name, Franklin Auto Body was a real estate holding company operated and principally owned by Wicker, who also was petitioner's accountant and tax return preparer. Petitioner deducted expenses for meals he purchased in 1978 and 1979 for Wicker and other individuals identified by petitioner as "unpaid help." Professional fees deducted by petitioner in those years allegedly were incurred for accounting services rendered by Wicker on behalf of petitioner's construction business. On Schedule C of his 1979 return, petitioner deducted the cost of homeowner's insurance covering two residential properties, one owned by his mother and one owned by the estate of his father. Petitioner also purchased and installed a boiler for each residence, the cost of which he deducted as supplies used in his business. The Schedule C deductions claimed by petitioner and those allowed by respondent are summarized below: 1977
1978
Claimed
Allowed
Amount in
Claimed
Allowed
Amount in
By P
By R
Dispute
By P
By R
Dispute
Deductions: Rent
$6,520
$72
$6,448
$6,744
$114
$6,630
Meals
230
230
Prof. Fees
250
250
383
133
250
Insurance
Supplies
856
856
Total
$6,770
$72
$6,698
$8,213
$247
$7,966
*175 1979
Claimed
Allowed
Amount in
By P
By R
Dispute
Deductions: Rent
$2,094
$544
$1,550
Meals
261
261
Prof. Fees
500
250
250
Insurance
951
174
777
Supplies
878
878
Total
$4,684
$968
$3,716
On his 1978 Federal income tax return, petitioner claimed an investment tax credit in the amount of $187.20 with respect to a stereo sound system he leased to Wicker Enterprises, Inc., a corporation controlled by Wicker. The written agreement executed by petitioner and Wicker on May 17, 1978, regarding the lease of the sound system reflected that annual lease payments were due from Wicker Enterprises in the amount of $500 beginning on May 17, 1979, throughout the five-year term of the lease. Apparently, however, none of the payments required under this lease were made by Wicker Enterprises. OPINION Advance Payments received from Knox Lumber Company
Petitioner argues that under the completed contract method of accounting he properly may exclude the $7,100 and $24,040 advance payments from gross income in the year of receipt. Respondent argues that petitioner is not entitled to use the completed contract method of accounting *176 because the contracts with Knox Lumber Company under which petitioner received the advance payments were not long-term contracts within the meaning of section 1.451-3(b)(1), Income Tax Regs.
Although a taxpayer generally is free to choose his method of accounting, the method chosen must consistently be applied and will be respected only where, in the opinion of the Commissioner, it clearly reflects income. Sec. 446(b)[1]; sec. 1.446-1(a)(2), Income Tax Regs.; Reco Industries, Inc. v. Commissioner,83 T.C. 912, 919-920 (1984), on appeal (4th Cir., July 30, 1985). Section 446(b) grants to respondent broad discretion to recompute a taxpayer's income under an accounting method that clearly reflects income and any such recomputation by respondent is entitled to a strong presumption of correctness. Commissioner v. Hansen,360 U.S. 446, 467 (1959); Keller v. Commissioner,725 F.2d 1173 (8th Cir. 1984), affg. 79 T.C. 7 (1982). The question of whether a particular accounting *177 method clearly reflects income is primarily a factual question that varies from business to business. Sam W. Emerson Co. v. Commissioner,37 T.C. 1063, 1067 (1962). Generally, advance payments are includable in the gross income of a cash basis taxpayer when actually or constructively received. Sec. 1.451-1(a), Income Tax Regs.; United States v. Wiese,750 F.2d 674 (8th Cir. 1984); Beaver v. Commissioner,55 T.C. 85 (1970). Under certain circumstances, however, a cash basis taxpayer may report amounts received in connection with a long-term contract under, among other permissible methods, the completed contract method of accounting, in which case all income attributable to or derived from the long-term contract is includable in gross income for the taxable year in which the contract is completed. Sec. 1.451-3(d)(1), Income Tax Regs.; [2]Reco Industries, Inc. v. Commissioner,supra at 921; *178 Penninsula Steel Products & Equipment v. Commissioner,78 T.C. 1029, 1039 (1982). A long-term contract is defined as a building, installation, construction, or manufacturing contract which is not completed in the taxable year in which it is entered into provided the contract, insofar as manufacturing is concerned, involves the manufacture of -- (a) unique items of a type which is not normally carried in the finished goods inventory of the taxpayer, or (b) items which normally require more than 12 calendar months to complete (regardless of the duration of the actual contract). [Sec. 1.451-3(b)(1)(ii), Income Tax Regs.] *179 Petitioner argues that his use of the completed contract method of accounting herein is proper because the contracts with Knox Lumber Company were not completed within 12 months and thus were long-term contracts. Respondent argues that the brackets manufactured by petitioner under the contracts were not unique items because petitioner produced 8,000 of them during the years 1978 and 1979. Moreover, respondent contends that because petitioner could produce as many as 250 brackets per week, his contracts with Knox Lumber Company were not long-term contracts within the meaning of section 1.451-3(b)(1), Income Tax Regs.
We agree with respondent. A multi-unit manufacturing contract is considered to be a long-term contract only if the manufacturing process requires more than 12 months to produce each individual unit. Section 1.451-3(b)(1)(ii), Income Tax Regs., provides as follows: [A] contract to manufacture 15,000 folding chairs which take 3 days each to manufacture is not a long-term contract * * * even though it takes more than *180 12 calendar months to manufacture all 15,000 chairs and the contract is not completed within the taxable year it is entered into. [Sec. 1.451-3(b)(1)(ii), Income Tax Regs.] Petitioner is not entitled to use the completed contract method of accounting for income received under the two contracts with Knox Lumber Company and must include in income the $7,100 and $24,040 advance payments received thereunder in accordance with the cash method of accounting. We sustain respondent on this issue. Schedule C Deductions
Petitioner has failed to substantiate amounts deducted as rent on his Federal income tax returns for 1977, 1978, and 1979, in excess of the amounts allowed by respondent. With respect to the $6,448 in dispute for 1977, petitioner relies on five checks which petitioner issued to Wicker in Jury and August of 1977 and which petitioner alleges were in payment of rent. The notations on the checks, however, make it clear that $5,900 of the amount in dispute was a loan by petitioner to Wicker. Petitioner contends, however, that in December of 1977, he agreed to convert the $5,900 he had loaned to Wicker to a rental payment. On the record *181 before us, however, there is no credible evidence that petitioner had a rental obligation that would support such a recharacterization of the $5,900 payment. Petitioner offered no evidence concerning the $348 balance of the rent in dispute for 1977. With respect to the $6,630 rental payment in dispute for 1978, petitioner submitted as substantiation for $770 thereof seven cancelled checks written in 1978 which were made payable either to Wicker or to alleged creditors of Wicker. Petitioner testified that he paid the remaining $5,860 of the 1978 rent in dispute to Wicker out of the proceeds of a loan he received from Connie Koller ("Koller"). As evidence of the loan from Koller, petitioner introduced a written loan agreement dated January 3, 1979, allegedly signed by Koller. In her testimony, however Koller denied signing the agreement or loaning any funds to petitioner. [3]
*182 To substantiate the $1,550 rental payment in dispute for 1979, petitioner introduced four handwritten memos signed by Wicker, each of which listed several alleged rental payments totalling $1,565. The memos also indicate that petitioner paid Wicker $1,000 in small amounts of cash throughout 1979, and that $565 in cash was paid to Wicker on an unspecified date from the proceeds of a second loan allegedly received by petitioner from Koller. We are not convinced that the checks issued by petitioner to Wicker and to Wicker's alleged creditors in 1978 and 1979 were intended as payments of rent. The evidence indicates that Wicker often gave petitioner cash amounts against which petitioner, as a convenience to Wicker, would issue his personal checks payable to Wicker's creditors. The seven checks written by petitioner in 1978 in favor of Wicker most likely represent such convenience checkwriting on Wicker's behalf. We also reject petitioner's contention that he received loans from Koller in 1978 and 1979 to make rental payments. Koller denied making any loans to petitioner and other evidence relating to those purported loans is not consistent. On the one hand, petitioner testified *183 that he received a $5,860 cash loan from Koller in 1978, the proceeds of which he paid to Wicker as rent. Wicker, however, suggested that the loan from Koller did not result in any money changing hands, and that petitioner simply assumed $5,860 of Wicker's outstanding debts to Koller. Whatever actually may have occurred, petitioner has failed to convince us that he is entitled to deductions for rent during the years in issue in excess of amounts allowed therefor by respondent. We sustain respondent on this issue. Petitioner deducted on his 1978 and 1979 Federal income tax returns $230 and $261, respectively, for meals he contends were purchased for Wicker and other "unpaid help" in connection with his business. Section 274(d) provides that a taxpayer must substantiate by adequate records or by sufficient evidence corroborating his own statement the amount, time, place, and business purpose of travel and entertainment expenses, including business meals, and the business relationship to the taxpayer of the person entertained. To substantiate meal expenses deducted on petitioner's 1978 return, *184 petitioner submitted a list of 18 meals purchased by petitioner and with either Wicker's name or the notation "unpaid help" associated with each meal. Petitioner did not include in the list the business purpose of the meals. Petitioner also introduced 17 of his cancelled checks which correspond with 17 of the meals listed and which indicate the amount of each meal and the restaurant in which the meals were purchased. To substantiate meal expenses deducted on his 1979 return, petitioner introduced several of his cancelled checks, but he did not introduce any list or description of the meals. None of the 1978 or 1979 checks nor any other documentation identify the business purpose of the meals. We agree with respondent that the documentation submitted by petitioner does not rise to the standard of proof required by section 274(d) to substantiate expenses for business meals. We hold for respondent on this issue. Petitioner deducted $250, $383, and $500 in 1977, 1978, and 1979, respectively, for fees paid to Wicker for accounting services relating to petitioner's construction business. Of those amounts, respondent allowed $133 in 1978 and $250 in 1979, but disallowed for lack of substantiation *185 the remaining $250 claimed in each of the years in issue. Petitioner submitted a letter signed by Wicker stating that Wicker had been paid accounting fees by petitioner in the full amount deducted on petitioner's returns. In light of petitioner's testimony and the letter from Wicker, we conclude that petitioner is entitled to deduct the accounting fees paid in 1977, 1978, and 1979, as claimed on petitioner's returns. With regard to the cost of two homeowner's insurance policies and supply expenses claimed on his 1979 Federal income tax return, petitioner testified that the insurance premiums were paid to protect and insure his expected inheritance and that the supplies related to an agreement with the executor of his father's estate to repair portions of the estate property but he did not elaborate as to the terms of any such agreement. Petitioner offered no explanation of how the repairs to his mother's property were connected to his business. We agree with respondent that petitioner has failed to establish that the insurance premiums and supplies he purchased were related to his construction or any other trade or business of petitioner and that they are not allowable. *186 Investment Tax Credit
With regard to the investment tax credit in the amount of $187.20 relating to the stereo sound system petitioner leased to Wicker Enterprises, petitioner submitted a written lease agreement dated May 17, 1978, which reflected an annual lease payment due from Wicker Enterprises of $500 throughout the five-year term of the lease. Respondent disallowed the investment tax credit because petitioner, as a noncorporate lessor, failed to qualify for the credit under section 46(e)(3). Section 46(e)(3)[4] provides that a noncorporate lessor who did not manufacture or produce the property must meet two conditions in order to be entitled to an investment tax credit in leased property. First, the term of the lease (taking into account options to renew) must be less than 50 percent of the useful life of the leased property. Second, the lessor (petitioner herein) must incur expenses with respect to the leased property during the first 12 months after the property is transferred to the lessee in an amount exceeding 15 percent of the rental income produced by the leased property. *187 Sec. 46(e)(3)(B). Thus, in order for petitioner to be entitled to the claimed investment tax credit, he must prove that the useful life of the sound system exceeded 10 years and that he incurred expenses between May 17, 1978, any May 17, 1979, in connection with the sound system which exceeded $75 (15 percent of $500). *188 Petitioner contends that the sound system leased to Wicker Enterprises had a useful life of at least 15 years and that because he received no income from the lease during 1978, any business expense he incurred would exceed 15 percent of zero and thus qualify the investment for the investment tax credit under section 46(e)(3)(B). Respondent argues that petitioner is not entitled to the investment tax credit with respect to the leased sound system because petitioner has failed to present any evidence of the useful life of the sound system other than the seven-year useful life reported therefor on he schedule for depreciation included in his 1978 tax return. Further, respondent argues that petitioner has failed to prove the amount of the expenses he incurred with respect to the sound system during the first 12 months of the lease. For the reasons indicated by respondent, we agree that petitioner is not entitled to an investment tax credit with respect to the sound system. Petitioner has failed to present any evidence or testimony to establish the useful life of the sound system or the amount of the expenses he incurred with respect to the sound system. Other Miscellaneous *189 Issues
In his notice of deficiency, respondent disallowed deductions in the amounts of $31, $46, and $4 in 1977, 1978, and 1979, respectively, for depreciation of equipment and allowed the cost of that equipment as part of cost of goods sold. Petitioner presented no evidence or testimony at trial on this issue and makes only vague arguments with respect thereto on brief. We sustain respondent on this issue. On his 1979 Federal income tax return, petitioner deducted a total of $736 for real estate taxes paid with respect to his residence at 395 Daly Street. In his notice of deficiency, respondent disallowed 34 percent of that amount ($251) as a Schedule C expense, but allowed that same amount as an additional itemized deduction on petitioner's Schedule A. Petitioner contends that the property at 395 Daly Street was used by him entirely for business purposes and that he is entitled to deduct 100 percent of the real estate taxes he paid with respect thereto as a Schedule C business expense. Petitioner, however, offered no evidence which would overcome the presumption of correctness attaching to respondent's determination on this issue. Respondent's allocation of the use of *190 the property (2/3 for business use and 1/3 for personal use) is reasonable, and we sustain respondent on this issue. Finally, petitioner argues that he is not liable for self-employment taxes for the years in issue because he contends that he did not have taxable income from his business in excess of $400 in any of those years. Respondent correctly notes that the resolution of this issue is dependent upon our determination of the other issues herein. In light of our resolution of those issues, petitioner did have taxable income from his construction business in excess of $400 in each of the years in issue and the self-employment tax applies. We so hold. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as in effect during the years in issue.↩
2. Sec. 1.451-3(d)(1), Income Tax Regs., provides in relevant part: (d) Completed contract method -- (1) In general. Except as otherwise provided in paragraph (d)(2), (3), or (4) (relating to disputes) of this section, under the completed contract method, gross income derived from long-term contracts must be reported by including the gross contract price of each contract in gross income for the taxable year in which such contract is completed * * *.↩
3. An employee of Wicker Enterprises, Inc., testified that she witnessed Koller sign the loan agreement with petitioner. That employee, however, began working for Wicker Enterprises in June of 1980, and thus could not have been present if the loan agreement was in fact executed on January 3, 1979.↩
4. Sec. 46(e)(3) provides: (3) Noncorporate lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. * * *↩